**NATIONAL METAL FINISHING COMPANY, INC., Plaintiff, Appellant,**

v.

**BARCLAYSAMERICAN/COMMERCIAL, INC., Defendant, Appellee.**

**No. 89–1736.**

United States Court of Appeals, First Circuit.

Heard Jan. 8, 1990.

Decided March 29, 1990.

Robert Aronson, for plaintiff, appellant.

Robert D. Cultice, with whom Brooks S. Thayer and Goldstein & Manello, Boston, Mass., were on brief, for defendant, appellee.

Before BREYER, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

BOWNES, Senior Circuit Judge.

This is an appeal from a memorandum and order of the district court reversing a judgment initially entered by it in favor of appellant National Metal Finishing Company, Inc. ("National") and entering judgment for appellee BarclaysAmerican/Commercial, Inc. ("Barclays") instead. In its first opinion and order, issued after a four day bench trial, the court found that there was an implied contract between Barclays and National and that Barclays had breached the contract. The court then reconsidered this ruling pursuant to motions filed by Barclays under Fed.R.Civ.P. 52(b) and 59(e). On reconsideration, the court concluded that it had clearly erred in finding an implied contract, and entered a new judgment in favor of Barclays. National

appeals from this second judgment, challenging both the district court's power to reverse itself and the propriety of the court's doing so on the facts of the case.

## I. BACKGROUND

During all times relevant to this lawsuit, National was a Springfield, Massachusetts corporation engaged in the business of metal plating and finishing. Barclays was a North Carolina corporation engaged in the business of commercial factoring, advancing money to companies in exchange for the assignment to Barclays of the companies' accounts receivable. The dispute between National and Barclays arose out of their common relationship with the Las Brisas Fan Company ("Brisas"), a ceiling fan manufacturer with an assembly plant in Chattanooga, Tennessee and a sales office in Yoakum, Texas.

In March, 1981, National began plating and finishing ceiling fan parts for Brisas. At roughly the same time, in an unrelated arrangement, Barclays and Brisas entered into a written factoring agreement whereby Brisas would assign the accounts receivable from its fan sales to Barclays and Barclays would advance cash to Brisas against the accounts receivable as they were assigned.

Approximately one year after the parties entered into these independent agreements, Brisas' business began to decline. By the fall of 1982 Brisas owed $150,000 to National for fan plating services, an amount that National ultimately wrote off as an uncollectible bad debt for 1982. Brisas also owed at least $620,000 to Barclays for an over-advance that Barclays had given Brisas in late 1981 to fund a build-up of fan inventory in preparation for the 1982 selling season.

In October, 1982, Barclays held a meeting with Brisas to discuss Brisas' financial situation and the repayment of its debt to Barclays. The president of National, Donald Schulz, attended this meeting, as did the president of Brisas, Robert Drake. Drake and Schulz presented a plan to move Brisas' assembly operation from Tennessee

to the National plant in Massachusetts, as part of an effort to reduce Brisas' overhead expenses and restore profitability. Schulz also indicated that he planned to invest money in Brisas to help finance the move and that he would oversee Brisas' fan production operation after the move.

The relocation was completed by January, 1983. Barclays agreed to continue factoring Brisas' accounts receivable, and National continued to plate fan parts. National, however, was unwilling to extend Brisas additional credit and thus entered into a new payment arrangement whereby Brisas agreed to pay for National's plating services on a partial c.o.d. basis.

Despite the new arrangement, Brisas quickly fell behind in its payments to National. Schulz advised Brisas that National could not increase its exposure and would cease fan production unless a new payment plan were established. Drake invited Schulz to attend a Brisas board of directors meeting on March 7, 1983, to discuss the matter.

At the March 7 meeting, Schulz informed representatives of Brisas and Barclays that he could not extend additional credit to Brisas. To address Schulz's concerns, Brisas and Barclays agreed that Barclays would wire money directly to National on a weekly basis to pay Brisas' fan plating bills. As part of this new payment arrangement, Brisas gave Barclays written authorization to advance money to National against any accounts receivable assigned to Barclays by Brisas.

Within weeks, however, the payments to National again began to fall behind. Schulz notified Barclays that its weekly payments were falling behind and that National could not continue to increase its exposure. Barclays invited Schulz to its North Carolina offices for an April 7 meeting to try to resolve the problem.

At this meeting, Barclays gave Schulz a check in the amount of $24,982 to bring the payments to National up to date. Barclays also instructed National's bookkeeper to call Barclays every Monday with the prior week's Brisas expenses so that Barclays could send a check in that amount.

For a number of weeks following the April 7 meeting, National received timely payments from Barclays for Brisas' fan plating expenses. Brisas' financial troubles continued, however, and the payments began to fall behind again in May. Schulz was unsuccessful in his attempts to obtain full payment from Barclays and also was unsuccessful in his efforts to obtain any written guarantee of full payment from Barclays.

Brisas went into involuntary bankruptcy on June 24, 1983. At a July meeting, Schulz requested that Barclays pay National for all of Brisas' outstanding expenses with National. Barclays refused, contending that it had made no independent agreement with National to do so.

As a result of this refusal, National brought suit against Barclays in federal district court, alleging that Barclays had breached an unconditional agreement with National to pay Brisas' fan plating expenses. Barclays answered that no such agreement ever was formed with National. Barclays contended that any payment arrangement with National had consisted solely of an agreement between Barclays and Brisas for Barclays to wire money directly to National on Brisas' behalf to the extent that Brisas had assigned sufficient accounts receivable to Barclays to cover the payment.

After a four day bench trial, the district court issued findings of fact and conclusions of law holding that an implied contract had indeed been formed between Barclays and National in the March and April meetings whereby Barclays had agreed to pay National for Brisas' fan plating expenses. The court placed particular weight on its conclusion that Barclays had never made clear to Schulz that Barclays' weekly payments to National were contingent on the sufficiency of the accounts receivable assigned to Barclays by Brisas.

Barclays filed timely motions requesting the district court to reconsider its findings and conclusions pursuant to Fed.R.Civ.P. 52(b) and 59(e). Referring in detail to specific testimony and documentary evidence,

Barclays argued that the trial record showed that it had made amply clear to National that any payments to National from Barclays were contingent on the sufficiency of Brisas' accounts receivable.

After careful review of the trial transcript, which had not been available to the court in preparing the first opinion, the court granted Barclays' motion, stating in a new memorandum and order that it had failed to consider certain testimony and evidence in reaching its first decision. Concluding that it had clearly erred in finding that Barclays had not made apparent to National the connection between its payments and the sufficiency of Brisas' accounts receivable, the court held that no implied contract had been formed and entered a new judgment in favor of Barclays. National appeals from this second judgment.

Three issues are raised in this appeal: (1) the trial court's power to reverse itself; (2) the proper standard that should govern the court's decision to reverse, and the standard that governs our review of this decision; and (3) our application of these standards to the facts of this case.

## II. POWER OF REVERSAL

The district court specifically grounded its power to reverse itself on Fed.R.Civ.P. 52(b), which provides that a court may amend its findings of fact and amend its judgment accordingly. Because of the court's explicit reliance on Rule 52(b), National focuses the main thrust of its challenge on a court's powers under 52(b). We point out, however, that Barclays relied on Fed.R.Civ.P. 59(e) as well as on Rule 52(b) in its request to the court that it reconsider its opinion.[1]

Because of the close relationship between Rule 59(e) and Rule 52(b), we do not think that it is of dispositive significance that the district court relied on 52(b) rather than 59(e). Circuit precedent suggests that challenges to the correctness of a judgment are properly construed as motions under Rule 59(e). *See, e.g., Rodriguez–Antuna v. Chase Manhattan Bank Corp.,* 871 F.2d 1, 2 (1st Cir.1989); *Appeal of Sun Pipe Line Company,* 831 F.2d 22, 24 (1st Cir. 1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988); *see also Huff v. Metropolitan Life Ins. Co.,* 675 F.2d 119, 122 (6th Cir.1982). The relief sought under 52(b) and 59(e) is so similar, however, that if the district court had the power to reverse itself under either 52(b) or 59(e), then National's challenge to this power must fail, regardless of whether the court in fact relied on the less appropriate provision. *See St. Mary's Hospital Medical Center v. Heckler,* 753 F.2d 1362, 1365 (7th Cir.), *cert. denied,* 472 U.S. 1028, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985); *United States Gypsum Co. v. Schiavo Bros.,* 668 F.2d 172, 179 n. 8 (3d Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982); 6A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 59.12[1], at 264–65 (2d ed.1989). Thus, our inquiry turns to whether the court had the power to reverse itself under either Rule 52(b) or 59(e).

### A. *Reversal Under Rule 52(b)*

Rule 52(b) provides, in pertinent part, that "[u]pon motion of a party made not later than 10 days after entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly." National contends that this provision allows a trial court to amplify or expand upon its initial factual findings, but does not permit the court to

---

1. Rule 52(b) provides:
    Upon motion of a party made not later than 10 days after entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly. The motion may be made with a motion for a new trial pursuant to Rule 59. When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the district court an objection to such findings or has made a motion to amend them or a motion for judgment.
  Rule 59(e) provides:
    A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment.

so thoroughly alter its findings as to reverse completely the prior judgment.

■■■ We disagree. Although Rule 52(b) is not intended to allow parties to rehash old arguments already considered and rejected by the trial court, *see American Train Dispatchers Ass'n v. Norfolk & Western Ry. Co.,* 627 F.Supp. 941, 947 (N.D.Ind.1985), its purpose is to permit the correction of any manifest errors of law or fact that are discovered, upon reconsideration, by the trial court. Under the rule, the trial court is the first recourse for the correction of errors. If the errors, in its opinion, require reversal of its first judgment, we see no good reason why it must remain shackled to that judgment. Consequently, we join those authorities that have stated that "a party may move to amend the findings of fact even if the modified or additional findings in effect reverse the judgment." *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1219 (5th Cir.1986); *see also* 5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 52.11[2], at 197–99 (2d ed. 1989) ("If the trial court has entered an erroneous judgment it should correct it.").

### B. *Reversal Under Rule 59(e)*

■■■ Rule 59(e) provides that "[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment." The Notes of the Advisory Committee on Rules state that the subdivision was added to make clear "that the district court possesses the power ... to alter or amend a judgment after its entry."

In challenging the trial court's power to reverse itself under 59(e), National cites a number of cases in which courts have rejected attempts by the party who lost at trial to seek amendment of the court's findings under Rule 59(e) as a way to reverse the judgment against them. For example, in *Erickson Tool Co. v. Balas Collet Co.,* 277 F.Supp. 226 (N.D. Ohio 1967), *aff'd,* 404 F.2d 35 (6th Cir.1968), the trial court rejected a Rule 59(e) attempt by the losing plaintiff to reverse the judgment. The court stated that the plaintiff was simply putting forth previously proposed findings of fact already considered and rejected by the court in an attempt to obtain a complete reversal of the court's judgment, which was not the purpose of Rules 52(b) and 59(e). *See id.* at 234; *see also Durkin v. Taylor,* 444 F.Supp. 879, 889–90 (E.D.Va. 1977); *Frito–Lay of Puerto Rico, Inc. v. Canas,* 92 F.R.D. 384, 390 (D.P.R.1981).

Interpreted broadly, these cases arguably hold that reversal is not the purpose of Rule 59(e). The courts made these broad holdings, however, in factual contexts where the losing party simply was rehashing old arguments already rejected by the trial court. The holdings, therefore, may be construed as stating no more than the proposition that Rule 59(e) does not allow the losing party to repeat old arguments previously considered and rejected, or to raise new legal theories that should have been raised earlier. *See Federal Deposit Ins. Corp. v. Meyer,* 781 F.2d 1260, 1268 (7th Cir.1986) (stating this proposition).

This more precise reading of the cases relied on by National brings them into line with the numerous decisions of other courts holding that Rule 59(e) may properly be invoked to request a district court to reconsider, vacate, or even reverse its prior holding. *See, e.g., Kort v. Western Surety Co.,* 705 F.2d 278, 280–81 (8th Cir.1983) (upholding trial court's power, under Rule 59(e), to rescind prior grant of summary judgment); *Huff v. Metropolitan Life Ins. Co.,* 675 F.2d 119, 122 (6th Cir.1982) ("Rule 59(e) may be utilized in timely attempts to vacate judgment."); *Smith v. Hudson,* 600 F.2d 60, 62 (6th Cir.) (stating that Rule 59(e) encompasses motions that ask a court "to vacate and reconsider, or even to reverse its prior holding"), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979); *Greengrass Enterprises, Inc. v. Rotfeld,* 83 F.R.D. 159, 161 (E.D.Pa.1979) (holding that Rule 59(e) encompasses motions to vacate and effectively reverse a judgment entirely); *see also Binkley Company v. Eastern Tank, Inc.,* 831 F.2d 333, 336 n. 4 (1st Cir.1987) ("A party may ... properly invoke Rule 59(e) to request a District Court to reconsider or correct errors of law."). *But see Brooks Bros. v.*

*Brooks Clothing of California, Ltd.,* 5 F.R.D. 14, 15–16 (S.D.Cal.1945). For much the same reasons as we stated regarding Rule 52(b), we now explicitly join those courts that have found Rule 59(e) to encompass motions to amend that require reversal of the prior judgment. Thus, under either Rule 52(b) or Rule 59(e), the district court below had the power to amend its findings of fact and conclusions of law even when doing so resulted in the reversal of its initial judgment. *Cf. United States Gypsum Co.,* 668 F.2d at 176–80 (upholding a successor trial judge's power to reverse an initial judgment and impose liability pursuant to a motion for reconsideration).

## III. STANDARDS OF REVIEW

Given our conclusion that the district court did have the power to reverse itself under Rule 52(b) and 59(e), the next issue concerns the standard that governed the court in reconsidering its initial judgment, and the proper standard that should govern our review of the district court's actions.

National contends that the trial court could only reverse its initial judgment if it found some clear error in its findings of fact or conclusions of law. It argues, therefore, that in reviewing the trial court, we must look at the first opinion ourselves and determine whether we find it to have been clearly erroneous. If we cannot find the first opinion to be clearly erroneous, then according to National, we must reinstate the initial judgment.

Barclays, conversely, contends that the district court properly could amend its factual findings as long as the amendments were supported by the evidence. Consonant with this, Barclays argues that the district court's actions are reviewable only for abuse of discretion, and no such abuse can be found unless we deem the *second* opinion to be clearly erroneous.

Although both arguments have merit, we conclude that Barclays' "abuse of discretion" formulation is the better articulation of the governing standard. We recognize, as National argues, that the concept of clear error does play a role in Rule 52(b) and 59(e) analysis. The commission by the trial court of some manifest error of law or fact is one of the grounds that justifies a trial court's grant of a Rule 52(b) or 59(e) motion,[2] and was the ground relied upon by Barclays below in seeking reconsideration. National utilizes this principle of manifest error as the basis for its argument that the trial court's reversal of its initial judgment can only be upheld if we find the first judgment to have been clearly erroneous.

The principle of manifest error, however, has been articulated by courts in the context of the trial court's scrutiny of its own findings pursuant to a Rule 52(b) or 59(e) motion. We are reluctant to interpret "manifest error" in this context as permitting trial courts to amend their findings only in those situations where an appellate court would deem the findings to be clearly erroneous. The policies motivating the clearly erroneous standard in the appellate context include a general deference to the trial court's fact-finding based on the accepted principle that the trial judge's first-hand view of the evidence and the witnesses places her in the best position to make accurate and fair factual determinations. *See Anderson v. Bessemer City,* 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Thus, an appellate court will overturn such determinations only when it finds them to be clearly erroneous. *See* Fed.R.Civ.P. 52(a) ("Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.")

These policy considerations do not have the same relevance to a trial court's reconsideration of its own factual findings pur-

---

**2.** The other frequently articulated grounds are: (1) newly discovered evidence, and (2) an intervening change in the law. *See, e.g., Leong v. Hilton Hotels Corp.,* 689 F.Supp. 1572, 1573 (D.Haw.1988); *Dow Chemical Pacific Ltd. v.* *Rascator Maritime S.A.,* 609 F.Supp. 451, 452–53 (S.D.N.Y.1984), *vacated, in part, on other grounds,* 782 F.2d 329 (2d Cir.1986); *Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224, 244 (N.D.Ill. 1976).

suant to a Rule 52(b) or 59(e) motion. Indeed, the policies actually militate against National's arguments on appeal. If we were to equate Rule 52(b)'s and 59(e)'s manifest error principle with the appellate clearly erroneous standard, and uphold the trial court's finding of clear error only if *we* found the first opinion to have been clearly erroneous, we would be undercutting any deference to the trial court's factfinding by subjecting the court's amendments of its own factual determinations to the high threshold of the appellate clearly erroneous standard. Furthermore, unlike the situation where an appellate court is reviewing a trial court's findings to determine whether they were clearly erroneous, a trial judge who is reviewing her own findings for manifest error pursuant to Rule 52(b) or 59(e) *was* present at the trial to view the evidence and the witnesses firsthand. This vantage point eliminates the need to impose the stringent burdens of the appellate clearly erroneous standard on a trial court that is reviewing its own findings for error. It also furnishes an independent justification for appellate deference to a trial court's determination that it committed manifest error. For all these reasons, we reject National's argument that we may uphold the district court's finding of error only if we find the first opinion to have been clearly erroneous.

■ We accept, instead, Barclays' argument that the trial court's actions in amending its findings are reviewable only for abuse of discretion. The abuse of discretion standard is supported by precedent in this and other circuits. Appellate courts consistently have acknowledged the considerable discretion possessed by trial judges in deciding whether or not to grant Rule 52(b) or 59(e) motions. *See, e.g., United States v. Parcel of Land and Residence Located Thereon at 5 Bell Rock Road*, 896 F.2d 605, 611 (1st Cir.1990); *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 743 (1st Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983); *see also United States v.*

*Anderson*, 591 F.Supp. 1, 4 (E.D.Wash. 1982). Where a grant or denial of the motion involves a matter other than a question of law, appellate review typically is limited to a determination of whether the trial court abused its discretion. *See Appeal of Sun Pipe Line Company*, 831 F.2d at 25; *Binkley Company v. Eastern Tank, Inc.*, 831 F.2d at 337; *see also Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir.1984), *cert. denied*, 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985); *Huff v. Metropolitan Life Ins. Co.*, 675 F.2d at 122; 6A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 59.15[4], at 311 (2d ed.1989). This abuse of discretion standard honors the firmly established policy of deference to trial court fact-finding.

■ Accordingly, we shall review the trial court's factual amendments and the reversal of its initial judgment in favor of National only for abuse of discretion. There is no such abuse if the trial record supports the amendments to the findings of fact and conclusions of law. *Cf. United States Gypsum Co. v. Schiavo Bros.*, 668 F.2d at 180 ("Where a new trial is not ordered, the trial record must support whatever additional findings of fact or conclusions of law a party seeks under Rule 52(b) or it is certainly not entitled to them."). Phrased another way, unless we find the *second* opinion to have been clearly erroneous in its findings, the court's second judgment must be upheld.

## IV. FACTUAL ANALYSIS

■ In its initial opinion, the district court held that an implied contract had been formed between National and Barclays whereby Barclays unconditionally agreed to pay Brisas' fan plating bills. The court stated that under Massachusetts law relating to implied contracts, "so long as Barclays acted in a way that appeared that it agreed [to pay Brisas' expenses unconditionally] and National reasonably relied on the appearance of the agreement, there was an agreement between the two."[3] The court found such an agree-

---

3. Neither party has challenged the court's general exposition of Massachusetts law relating to implied contracts, and thus we do not consider it to be an issue raised on appeal.

ment, based primarily on its determination that Barclays had never made clear to National that any agreement by it to send payments to National was conditioned on the sufficiency of the accounts receivable assigned to Barclays by Brisas.

In its second opinion, the district court reconsidered this finding and changed its mind, holding that Barclays had made sufficiently clear the link between its payments to National and the sufficiency of Brisas' accounts receivable. Because of this amendment to its findings,[4] the court altered its final judgment and ruled that no implied contract had been formed between National and Barclays.

Neither party appears to dispute the trial court's implicit conclusion that the formation of an implied contract, in this case, turns primarily on whether Barclays made sufficiently clear to National the link between its payments to National and Brisas' accounts receivable. National does dispute, however, the court's revised finding in favor of Barclays on this issue.[5] Thus, the crucial question before us is whether the trial court was clearly erroneous in finding, in its second opinion, that Barclays did adequately inform National that its payments were conditioned on the sufficiency of Brisas' accounts receivable. To conclude that the trial court was clearly erroneous, it is not enough that we find evidence in the record to support National's position. Rather, we must find the second opinion to be unsupported by any permissible view of the evidence, for "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *see also O'Brien v. Papa Gino's of America, Inc.*, 780 F.2d 1067, 1076 (1st Cir.1986).

The evidence most pertinent to this question concerns the events that transpired in the March 7, 1983 and April 7, 1983 meetings involving National, Barclays, and Brisas, as well as the parties' conduct subsequent to the meetings. National and Barclays agree that if any implied contract arose, it occurred at these meetings. The parties diverge quite widely, however, in their respective accounts of these meetings.

National's account rests heavily on the trial testimony of Donald Schulz, National's president. Schulz explicitly testified at trial that at both the March 7 and April 7 meetings, Barclays unconditionally agreed to pay National for Brisas' fan plating expenses. Schulz acknowledged that some mention was made by Barclays about conditioning payments to National on the sufficiency of Brisas' accounts receivable. According to Schulz, however, he firmly rejected any limitations on Barclays' willingness to pay, and Barclays acquiesced to his objections. Furthermore, Schulz testified that whenever he contacted Barclays to express concerns about late or deficient payments, Barclays repeatedly assured him that National would not get hurt and that it would be paid.

There was evidence to support certain elements of Schulz's testimony. For a number of weeks, Barclays did consistently wire money to National in accordance with weekly telephone calls Barclays received from National's bookkeeper, Adrienne Hill, specifying the prior week's Brisas expenses. These telephone calls were confirmed by invoices received at Barclays directly from National detailing those expenses related to Brisas fan production. In addition to weekly payments, at the April 7 meeting, Barclays gave Schulz a $24,982 check to catch up on current Brisas expenses. At the same meeting, Lewis Tabb,

---

**4.** The court amended certain other findings as well, such as its initial determination that Schulz reasonably could have believed he had an unconditional agreement with Barclays. These other amendments flowed from or were related to the court's primary revision, which was its amended finding that Barclays had made its payment conditions clear to National.

**5.** National also separately challenges the trial court's failure to award it damages for certain electric fan motors ordered by National but for which Barclays refused to reimburse National. This claim, we think, must rise or fall together with National's overall implied contract argument, and thus we decline to treat it separately.

a Barclays executive, telephoned Hill at National to confirm the weekly payment arrangement. In an April 20 memo written to file summarizing the meeting, Tabb describes himself as having told Hill that Barclays would send National money "as it was available during the week, at least as much as the prior week's expenses." The memo continues: "In talking with Ms. Hill, I was very explicit that we would be certain to get her the money for the last week's expenses but would not guarantee that the old indebtedness could be reduced ... unless [fan] shipments reached a good steady level."

Hill testified at trial that her understanding from such conversations with Barclays and from Schulz's statements to her after the March 7 and April 7 meetings was that Barclays had agreed unconditionally to pay National for Brisas' weekly expenses. As did Schulz, she also testified that whenever she telephoned Barclays about tardy or incomplete payments, Barclays told her not to worry. Hill did acknowledge on cross-examination that Barclays sometimes would refer to payment conditions, but she stated that she routinely responded that no payment conditions existed.

The testimony of Hill and Schulz was corroborated, at least in part, by the testimony of Michael Christopher, a BayBanks loan officer in charge of certain BayBanks loans to National. Christopher testified that he called Barclays to confirm that Barclays had agreed to wire money weekly to National for Brisas' expenses, and received confirmation of the payment arrangement. Christopher also stated that he had no recollection of Barclays' mentioning any conditions with respect to their wiring money to National.

Given that this evidence from trial supports National's contention that an implied contract between Barclays and National was formed, we must next determine whether there is other evidence sufficient to support the second opinion's contrary findings of the pertinent facts. If there is, the second opinion must stand. *See Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Barclays introduced considerable evidence at trial to support its contention that no implied contract ever was formed. Lewis Tabb, a Barclays executive who was present at the March and April meetings, testified that Barclays never independently and unconditionally agreed to pay National for Brisas' bills. According to Tabb, Barclays' agreement simply was to wire money to National on Brisas' behalf if Brisas had assigned sufficient accounts receivable to Barclays to cover the payment. Tabb stated that this arrangement was created to speed Brisas' payments to National, by eliminating the need for Barclays to send the cash from Brisas' factored accounts receivable first to Brisas before Brisas could redirect the cash to National to pay its fan plating bills. According to Tabb, the arrangement was not intended to place Barclays in the role of guarantor of Brisas' debts to National. Tabb also testified that the connection between Barclays' payments to National and the sufficiency of Brisas' accounts receivable was made clear at the March and April meetings. Tabb stated that any discussion at the meetings of weekly payments to National always was linked to National's production and shipment of a particular number of fans—e.g., if National shipped 75 fans per day, then there would be enough cash from accounts receivable to pay everyone.

The testimony of Marshal Pitts, another Barclays executive, corroborated that of Tabb. Pitts testified that any statement made to Schulz about payments from Barclays to National conditioned the payments on the sufficiency of the accounts receivable assigned to Barclays by Brisas. Gary Emery, a third Barclays employee, similarly stated in his deposition that he told Schulz that National would not receive money from Barclays unless there were sufficient accounts receivable to cover the payments.

In addition to this testimony of Barclays personnel, additional evidence at trial sup-

ported Barclays' position that no implied contract ever was formed. The corporate minutes of the March 7 meeting make no mention of Barclays' agreeing unconditionally to pay National for Brisas' expenses, which National claims took place at this meeting. The records of the meeting do show that Brisas gave written authorization to Barclays to advance money to National against any accounts receivable payable to Brisas. The existence of this authorization supports the inference that Barclays agreed to do no more than what the authorization states—transfer money to National on behalf of Brisas to the extent sufficient accounts receivable were available.

The trial record also establishes that the payments that were in fact made to National by Barclays never exceeded the available accounts receivable of Brisas. This evidence implicitly supports Barclays' argument that no agreement to the contrary existed. Similarly, the $24,982 check issued by Barclays to National in the April 7 meeting was not issued, according to the testimony of Tabb and Pitts, until Barclays verified that Brisas would have sufficient accounts receivable to cover the check in full in the next day or two. Moreover, the check stub was marked "for credit to the account of Brisas, Inc.," supporting Barclays' claim that the check was issued to National by Barclays on Brisas' behalf, rather than pursuant to an independent agreement between Barclays and National.

Additional evidence is contained in the April 20 memorandum to file written by Tabb to summarize the April 7 meeting. As discussed earlier, National cites this memo as support for its implied contract argument, emphasizing certain references that are made by Tabb in the memo to his having assured National's bookkeeper that Barclays "would be certain to get her the money for the last week's expenses." Review of the entire memo, however, illustrates that one reasonably could interpret these assurances as having been made in the context of Schulz's statement earlier in the meeting predicting that fan production shortly would be up to 1500 fans per month. The memo indicates that the par-

ticipants at the meeting used this 1500 fans per month figure as part of their calculations that there would be sufficient cash to pay Brisas' current expenses. Viewed this way, any assurances made by Tabb to Hill on April 7 were not inconsistent with Barclays' contention that it only agreed to make payments to National if there were adequate accounts receivable. Indeed, in the first paragraph of his April 20 memo, Tabb wrote "I reminded Don [Schulz] that we did not guarantee them that money would necessarily be sent every week but that the availability of money was determined by the level of shipments."

Two additional Barclays memos support a finding that no implied contract was formed. First, in a March 17 memo to file written by Gary Emery to summarize the March 7 meeting, Emery noted Schulz's request at the meeting that National be paid each week for the prior week's Brisas work. The Emery memo does not state, however, that Barclays agreed unconditionally to this request. Rather, the memo noted that if 200 fans could be shipped each week, there would be sufficient cash to begin paying off Brisas' debt with National and to keep up with current expenses. Similarly, in a March 31 memo to file, Emery summarized a meeting with Schulz at National's Springfield plant. Emery's memo explicitly states that "[w]e agreed to review the billings from National Metal and to continue the repayment of Schulz's debt and to fund his prior weeks [sic] cash expenses if he would assemble and ship 50 units a day." Both of these memos support the existence of a production or accounts receivable requirement for Barclays' weekly payments to National.

When this evidence is considered together with all the other evidence submitted by Barclays at trial, there is ample support for the district court's holding in its second opinion that no implied contract existed between Barclays and National. More specifically, substantial grounds exist to support the lower court's finding that Barclays made sufficiently clear that any agreement by it to make payments to National was conditioned on the sufficiency of the ac-

counts receivable assigned to Barclays by Brisas.

National vigorously argues that evidence exists to support the contrary conclusion as well. Although this may be true, the proper standard of review calls for us to review the second opinion to determine if it is clearly erroneous. Given the amount of evidence supporting the second opinion's findings, we conclude that there are two permissible views of the evidence and thus we cannot find the second opinion to be clearly erroneous. Consequently, we find that the district court committed no abuse of discretion in withdrawing its initial opinion, amending its findings of fact and conclusions of law pursuant to Rule 52(b), and issuing the second opinion and judgment.

*Affirmed.*