**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 21 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GEORGE A. MATTHEWS, JR.,

      Plaintiff-Appellee,

v.

C.E.C. INDUSTRIES CORP., a
Nevada corporation,

      Defendant-Appellant.

No. 98-4184

(D.C. No. 96-CV-729)

(D.Utah)

---

**ORDER AND JUDGMENT**   *

---

Before **SEYMOUR,** Chief Judge, **BRISCOE** , and **MURPHY,** Circuit Judges.

---

In this diversity action, George A. Matthews sued C.E.C. Industries Corp.

("C.E.C.") alleging that C.E.C. breached his employment contract, wrongfully

issued a "stop transfer" order to prevent him from receiving stock shares, and

ignored a directive from the company's board of directors to distribute the shares

of a C.E.C. subsidiary. After a bench trial, the district court rendered a verdict in

Matthews' favor on his breach of contract and "stop transfer" claims. C.E.C.

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

appeals, contending that the district court erred when it (1) denied C.E.C.'s motion to continue the trial and to substitute counsel; (2) denied C.E.C.'s motion for a new trial or to amend the judgment; and (3) awarded Matthews two-thirds of his fees and costs. We affirm.

## I.     The Motion to Continue the Trial and to Substitute Counsel

### A.     Background

C.E.C.'s first argument focuses on the performance of the company's trial counsel, Richard J. Leedy. On the first Monday of trial, Gerald Levine, the president of C.E.C., detected alcohol on Leedy's breath. Appellant's Appendix ("Aplt. App.") at 68. When asked by Levine if he could proceed, Leedy stated that he "didn't need a mother." Id.[1] On the second day of trial, Levine detected an even stronger scent of alcohol on Leedy's breath. According to Levine, Leedy seemed "shaky," would not listen to Levine's suggestions, and became belligerent when Levine asked him if he had been drinking. Id. at 68-69. Over the course of the next several hours, Leedy forgot to sit down after making an objection, spoke in a loud voice, and was corrected by the trial judge as he cross-examined Matthews. Id. Leedy's nose was bleeding during this time. Id. at 69.

---

[1] Levine also reported that he met with Leedy on the evening before trial to discuss the case. Leedy had several drinks at the meeting. Aplt. App. at 68.

2

At the conclusion of the second day of trial, Leedy went with Levine and Levine's wife to a pawn shop to purchase a briefcase. Leedy left the case files on the floor of the pawn shop and left the store to go to a tavern without informing Levine. Levine called the tavern and asked for Leedy, but Leedy refused to speak to him. Id.

C.E.C.'s problems with Leedy continued on the third day of trial. Leedy arrived several minutes late, and his nose was bleeding "profusely." Id. at 69, 576. Levine inquired whether Leedy was okay and whether he could continue. Leedy reiterated that he "didn't need a mother" and called Levine an "***hole." Id. at 69. As the proceedings recommenced, the district court noticed that Leedy appeared ill and asked about his well-being. Id. at 69, 576. Leedy broke down and began crying. Id. at 69-70. The court then held a meeting in chambers with Leedy and Matthews' counsel. Id. at 70, 577. When Leedy returned from the meeting he started sobbing again and (apparently off the record) used the same epithet to describe Levine. Id. at 70. The court decided to hold another meeting in chambers, this time with the parties' counsel and the Levines. Leedy stated in this meeting that "my clients have advised me they would prefer not to go forward with me I guess in the condition I'm in. My condition is that, yes, I have

3

a high blood pressure. I've had severe heart problems." Id. at 578.[2] Leedy

commented that he "w[ould] not represent these people anymore, so they're going

to have to get a new lawyer," and made an oral motion to withdraw. Id. at 581,

583, 587; see also id. at 582 (containing Leedy's statement that "I prefer not to

represent these people anymore"); id. at 584 (stating that Leedy wanted to

represent C.E.C. but had a "personal problem" with the Levines and "just

[couldn't] go on like this"). Levine expressed his view that:

> In Mr. Leedy's condition in my opinion [it] would really be unfair to
> go ahead today. It's not that I feel that we have to replace Mr.
> Leedy . . . . And without putting it on the record, because I don't
> want to do anything that would embarrass or do anything to hurt Mr.
> Leedy, . . . it would really be unfair for us, because he couldn't
> cross-examine me correctly. So we wouldn't care even if the delay
> was just until he felt better where he could say, "yes, I'm sure of
> myself."

Id. at 579-80. After some additional discussion, Levine went on to say that he

had

> been trying to be very eloquent and not say that Mr. Leedy has been
> drinking. But with the medicine . . . It's just an unfair scenario for
> us as officers of C.E.C. It's just – it's wrong. So I mean I was
> trying to not bring it up or do . . . anything that would embarrass Mr.
> Leedy, but since he says he doesn't want to represent us, you know,
> then we maybe have to figure something out.

Id. at 582-83. The court denied Leedy's oral motion to withdraw and continued

---

[2] Leedy suffered a serious heart attack approximately six months before trial. A "personal friend" of Leedy's informed the trial court of Leedy's condition by letter. Aplt. App. at 38.

4

the proceedings until the following Monday. Id. at 583, 585. The court remarked that it was aware of Leedy's health problems and that it was "alarmed by the fact that blood was coming out of [Leedy's] nose," id. at 578, 580, but stated that (1) only one more witness needed to be examined before closing arguments, id. at 577-78; (2) Leedy had done a "fine job" and the case had been "well tried so far," id. at 578, 584; (3) Matthews had an interest in resolving the case promptly, id. at 578, 583; and (4) its calendar was "just awful" and it might be difficult to find another time to conduct the trial. Id. at 578-79. After the court made this preliminary ruling, the parties went back into the courtroom to gather their belongings. When Levine suggested that Leedy put the court papers in his briefcase, Leedy told Levine to "go f*** yourself." Id. at 70.

The next day (Thursday), the trial court convened another conference with the parties and their attorneys. Levine informed the court that he and his wife wished to substitute Merlin O. Baker for Leedy as their trial counsel. Id. at 590-91. The Levines reiterated that they were "in a very bad situation, because Mr. Leedy has already stated that he does not wish to represent us. So there's no way we're ever going to feel that he is going to do the proper job for us when he point blank said that to us on the record yesterday." Id. at 593-94; see also id. at 596 (expressing Baker's view that "key witnesses" would be on the stand on the final day of trial and that the Levines "would strongly object to going forward . . .

5

with Mr. Leedy being their counsel"). The trial court explained that "changing lawyers is not something that occurs ordinarily" during the latter stages of a trial, id. at 591, 596, and that the court would permit Baker to act as C.E.C.'s counsel only if he "step[ped] right into the shoes of Mr. Leedy" and agreed not to do "anything other than what Mr. Leedy would do." Id. at 591, 599. The court also informed the Levines that a transcript would not be available for more than a month; delaying the trial to permit Baker to review the transcript would force Matthews to bear additional litigation expenses. Id. at 592-93. The court further stated that it understood Leedy was "in good health," id. at 593, was familiar with the case and ready to complete the final day of trial, id. at 594, and had done "an able job, a very fine, competent job." Id. at 598, 601. [3] When Baker indicated that it would be impossible for him to prepare by Monday (with or without the transcript), the court suggested that Baker could act as co-counsel with Leedy but refused to continue the proceedings and emphasized that it was "not going to try the case again." Id. at 597-98, 599-600; see also id. at 600 (stating that the case would not be "retried" and that Baker's assistance would be

---

[3] The trial court discounted Leedy's statements that he did not want to represent the Levines, noting that "[w]hen Mr. Leedy said that, Mr. Leedy was not feeling well, and as you are well aware, emotions were running high." Aplt. App. at 594. The court asked Leedy whether he could put aside his problems with the Levines and represent C.E.C. "competently and ably." Leedy responded by saying "Your Honor, if I could brag[,] I don't think they could get a better lawyer." Id. at 594-95.

limited to "wrapping up").

C.E.C. subsequently filed a written motion for "continuance of trial and substitution of counsel." Id. at 64. The motion recounted the company's troubles with Leedy, and alleged that "the relationship of attorney-client ha[d] been totally destroyed." Id. C.E.C. offered in the motion to "pay the cost of the transcript and attorneys' fees, as determined by the Court, to compensate the plaintiff for th[e] continuance." Id. at 66. When trial resumed on Monday, the trial court denied C.E.C.'s motion. Id. at 466. The court repeated that (1) Leedy had performed "effectively and competently," id. at 464; (2) the Levines had not indicated prior to the third day of trial that they were dissatisfied with Leedy, id.; (3) Leedy appeared healthy enough to proceed, id. at 464, 465; (4) substituting Baker as C.E.C.'s counsel would require the court to reschedule the trial on a "very crowded" docket, id.; (5) Matthews would be prejudiced by such a continuance and the court would be required to duplicate its prior efforts, id. at 465, 466; and (6) two days of trial had already passed and the case was "almost completed." Id. at 465; see also id. at 465-66 (finding that these considerations overshadowed "the fact that the relationship between Mr. Leedy and his [client] has encountered difficulties"). The court later permitted Baker to sit at C.E.C.'s table in the courtroom, id. at 467; to conduct a supplemental cross-examination of Matthews, Appellee's Supplemental Appendix ("Aplee. Supp. App.") at 17-24;

7

and to assist in the drafting of C.E.C.'s proposed conclusions of law. Aplt. App. at 542.

## B. Analysis

We review the trial court's denial of C.E.C.'s motion for an abuse of discretion. "Motions for continuance are addressed to the sound discretion of the trial court." Robinson v. United States, 718 F.2d 336, 338 n.1 (10th Cir. 1983); accord Fulton v. Coppco, Inc., 407 F.2d 611, 612 (10th Cir. 1969). The limits upon the trial court in this context are "not exacting," and "ordinarily the appellate court will not interfere with the district court's exercise of discretion." Robinson, 718 F.2d at 338 n.1; accord 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2352, at 230-32 (2d ed. 1995); see also Daniel J. Hartwig Associates, Inc. v. Kanner, 913 F.2d 1213, 1222 (7th Cir. 1990) (stating that "[m]atters of trial management are for the district judge" and that the court of appeals "will intervene only when it is apparent that the judge has acted unreasonably"). That said, some courts recognize that "[a]n exception to this general rule exists in certain cases when the illness of counsel is the ground for a continuance." Smith-Weik Mach. Corp. v. Murdock Mach. & Eng'g Co., 423 F.2d 842, 845 (5th Cir. 1970); cf. Hartwig, 913 F.2d at 1223 (listing "illness of counsel on the eve of trial" as a circumstance that may justify a continuance); Davis v. Operation Amigo, Inc., 378 F.2d 101, 103 (10th Cir. 1967) (observing

8

that "illness of a litigant severe enough to prevent him from appearing in court is always a legitimate ground for asking for a continuance").  Other courts recognize that a continuance may be warranted when a party reasonably requests additional time to obtain counsel or to prepare for trial, because "a myopic insistence upon expeditiousness in the face of [a] justifiable request for delay can render the right to defend with counsel an empty formality."  United States v. 9.19 Acres of Land, 416 F.2d 1244, 1245 (6th Cir. 1969); see also Santa Maria v. Metro-North Commuter R.R., 81 F.3d 265, 275 (2d Cir. 1996) (concluding that "when extenuating circumstances arise, a court should grant the parties a reasonable continuance to prepare").  These decisions illustrate the general proposition that "the common thread in the rare cases that reverse the denial of a continuance is the existence of changed circumstances to which a party cannot reasonably be expected to adjust without an extension of time."  Hartwig, 913 F.2d at 1222-23. [4]

---

[4] We recently intimated that the criteria used to evaluate the denial of a continuance in criminal cases should also be used in civil cases.  See Morrison Knudsen Corp. v. Fireman's Fund Ins. Co., 175 F.3d 1221, 1229 n.4 (10th Cir. 1999) (citing, among other cases, United States v. Johnson, 909 F.2d 1440, 1441-42 (10th Cir. 1990) and United States v. West, 828 F.2d 1468, 1469-70 (10th Cir. 1987)); see also 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2352, at 244 (2d ed. 1995) ("In determining whether the denial of a continuance is an abuse of discretion in civil proceedings, the federal courts often have applied standards established by the criminal law.").  The denial of a continuance in a criminal trial is an abuse of discretion only if it was "arbitrary or
(continued...)

9

We conclude the trial court did not abuse its discretion in denying C.E.C.'s motion for a continuance. "[A] request for a continuance properly may be denied" when the denial will not be prejudicial to the movant. 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2352, at 234-38 (2d ed. 1995); see also Ahern v. Scholz, 85 F.3d 774, 792 (1st Cir. 1996) (affirming the denial of a continuance for the purpose of obtaining new counsel and commenting that even if the district court abused its discretion, "the error was harmless"); Square Liner 360°, Inc. v. Chisum, 691 F.2d 362, 375 (8th Cir. 1982) (affirming the denial of a motion to continue trial and to substitute counsel because the performance of the movant's existing attorney did not result in a

---

[4](...continued)
unreasonable and materially prejudiced the [defendant]." United States v. Rivera, 900 F.2d 1462, 1475 (10th Cir. 1990) (citation omitted). Whether such a denial is unreasonable or arbitrary requires an evaluation of the following factors: (1) the diligence of the party requesting the continuance; (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; and (4) the need asserted for the continuance and the harm that appellant might suffer as a result of the district court's denial of the continuance. Id. (citing West, 828 F.2d at 1470). Similarly, to justify the substitution of counsel in a criminal case, "the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." United States v. Blaze, 143 F.3d 585, 593 (10th Cir. 1998) (quoting United States v. Padilla, 819 F.2d 952, 955 (10th Cir. 1987)). Applying these criteria here would not produce a different result. As explained in the text, C.E.C. cannot establish that the district court's failure to continue the trial and to substitute counsel caused "material prejudice" or an "apparently unjust verdict."

10

"miscarriage of justice"); cf. Smith-Weik , 423 F.2d at 844 (explaining that an abuse of discretion occurs only when "the denial of the motion for a continuance severely prejudiced the defendant"). Even though the relationship between Leedy and the Levines was unquestionably strained, C.E.C. was not prejudiced by the court's refusal to grant a continuance. The trial court repeatedly emphasized that Leedy represented C.E.C. "effectively and competently," cf. Square Liner , 691 F.2d at 375 (relying on the district court's determination that an attorney had been able to "examine and cross-examine witnesses, make objections, and . . . competently represent his clients"), and nothing in the record suggests that Leedy's performance on the final day of trial materially interfered with the company's defense. The trial court further reduced the likelihood of prejudice by permitting Baker to sit at C.E.C.'s table and to conduct a supplemental examination of Matthews. Moreover, any risk of prejudice from Leedy's physical problems was blunted in the context of a bench trial. While a jury might have been upset or offended by Leedy's nosebleeds, the trial court stated on the record that its judgment was not affected by Leedy's ailments. See, e.g., Aplt. App. at 580 (stating that the court was not repulsed by Leedy's appearance).

## II.     The Motion for a New Trial

11

## A. Background

In the mid to late 1980s, C.E.C.'s primary business was the design, manufacture, and sale of mineral processing equipment. C.E.C. conducted its business through Custom Equipment ("Custom"), a wholly-owned subsidiary with expertise in the field of gold processing. When gold prices declined, Custom's profitability began to tumble. As a result, C.E.C. "attempted to use Custom's expertise and know-how to develop carbon reactivation furnace technology for application in the water treatment industry." Appellant's Addendum ("Aplt. Add.") ¶ 3, at 2,. C.E.C. eventually sold Custom, but retained the patents associated with carbon reactivation. C.E.C. created a new subsidiary, C.E.I., to continue the development of water treatment technologies.      Id. ¶ 4, at 3. Like Custom, however, C.E.I. was not profitable and was a continuing drain on C.E.C.'s resources. It became apparent that C.E.C. needed additional funding to continue C.E.I.'s research and development efforts.      Id. ¶ 5.

A group of investors from Las Vegas, Nevada ("Las Vegas Group" or "Group") took control of C.E.C. in the Fall of 1993. The Group replaced Matthews, who had served as C.E.C.'s president since 1986, with Ronald Robinson.  Id. ¶ 6. Before Matthews surrendered his position to Robinson, however, he entered into an employment agreement ("agreement") with C.E.C. The agreement guaranteed Matthews a minimum annual salary of $100,000 for

12

three years, and compensated Matthews for certain losses by issuing him additional shares of C.E.C. stock. The agreement specified that its terms were to be construed according to Nevada law, and that the prevailing party in any action to enforce the agreement would be entitled to recover legal fees. Matthews signed the agreement as an "employee." Robinson, who was the vice-president of C.E.C. at the time, signed the agreement on behalf of the company. Id. ¶ 7.

Matthews and C.E.C. did not execute the agreement against a bullish financial backdrop. In 1991, for example, C.E.C. suffered a net loss of more than $390,000. C.E.C. reported a profit of less than $12,000 in 1992, and a profit of less than $2,000 in 1993. For the fiscal year ending in 1994, the company experienced a net loss of almost $300,000. In 1995, due in large part to C.E.C.'s decision to borrow money to purchase land in Las Vegas, the company suffered a net loss of more than $1,800,000. Id. ¶ 11, at 4-5. In 1995, the company also opted to forgive hundreds of thousands of dollars of debt owed by C.E.I. Id. ¶ 12, at 5.

Nevertheless, C.E.C.'s Board of Directors approved the agreement. The Board first approved the agreement at a special meeting on November 10, 1993. Four of the six members of the Board were present: Matthews, Robinson, Ronald Stoecklein, and Donald Stoecklein. Robinson and the Stoeckleins voted to ratify the agreement, with Matthews abstaining. Id. ¶ 8, at 4. The Board also ratified

13

the agreement on March 27, 1996. In response to a letter from Matthews indicating that he had not received his monthly salary since May 1995, the Board "unanimously approved a motion that Matthews would be paid the back salary owed him." Id. ¶ 17, at 6.

The Levines took control of C.E.C. in March 1996. Id. ¶ 18. The relationship between Matthews and the Levines was "acrimonious," id. ¶ 19, at 7, and Matthews' employment with the company ended in a matter of months. Id. ¶ 20. Matthews subsequently attempted to sell the C.E.C. stock shares he had obtained through the employment agreement. The Levines refused to remove restrictive legends on some of the shares, and issued a "stop transfer" order that prevented Matthews from selling the shares for two months. Id. ¶ 23, at 7-8. The Levines also declined to pay Matthews' monthly salary from June 1995 through September 1996. Id. ¶ 25, at 8. Matthews filed suit in the Fall of 1996, seeking back pay and compensation for the value of the restricted shares.

After a bench trial, the trial court determined that Matthews had been injured by C.E.C.'s breach of the employment agreement and by the "stop transfer" order. The court acknowledged that Matthews owed a fiduciary duty to the company and that "the agreement between Matthews and C.E.C. raise[d] the specter of self-dealing and conflict of interest." Id. ¶ 4, at 9. Even so, the court went on to find that the agreement was "properly ratified by a disinterested

14

board" as envisioned in Nevada Revised Statutes § 78.140.    Id. ¶¶ 4-8, at 9-11; see also id. ¶ 7, at 10 (citing § 78.140(2) (1993) to show that if "the votes of the common or interested directors are not counted at the meeting, then a majority of the disinterested directors may authorize, approve, or ratify a contract or transaction"). In light of that finding, the court applied the business judgment rule and required C.E.C. to rebut the presumption that "in entering into the agreement with Matthews, the board 'acted on an informed basis, in good faith and in the honest belief that the action was in the best interest of the corporation.'"    Id. ¶ 9, at 11 (citation omitted). The court concluded that C.E.C. "failed to overcome the presumption" and thus held in Matthews' favor on the breach of contract claim.    Id. ¶¶ 10-12, at 11-13. Because the court determined that the agreement was a "binding and enforceable contract," it also concluded that C.E.C. had "no legal right" to issue the "stop transfer" order.    Id. ¶ 19, at 15. The court awarded Matthews over $72,000 on his breach of contract claim and over $68,000 on his "stop transfer" claim.    Id. at 20-21.

C.E.C. timely filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a). [5] C.E.C. asserted that a new trial was warranted for at least

---

[5] Rule 59(a) provides in pertinent part that a new trial may be granted

in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the

(continued...)

15

three reasons. First, C.E.C. indicated that it wished to submit additional evidence, including Matthews' deposition testimony and the minutes of a September 30, 1993 Board meeting. C.E.C. argued that this evidence demonstrated the agreement was not ratified by "disinterested directors." Since the directors were not disinterested, said C.E.C., the trial court erred by analyzing the agreement under the business judgment rule. Second, C.E.C. contended that even without this additional evidence, the facts developed at trial established that the Board was not disinterested when it approved the agreement. Consequently, C.E.C. asked the trial court to make additional findings and to amend the judgment pursuant to Federal Rule of Civil Procedure 52(b). [6] Third, C.E.C. asserted that the manner in which the Las Vegas Group assumed control of the

---

[5](...continued)
courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

[6] Rule 52(b) states in full:

On a party's motion filed no later than 10 days after entry of judgment, the court may amend its findings – or make additional findings – and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59. When findings of fact are made in actions tried without a jury, the sufficiency of the evidence supporting the findings may be later questioned whether or not in the district court the party raising the question objected to the findings, moved to amend them, or moved for partial findings.

16

company was illegal. C.E.C. noted that the Group did not acquire enough stock to obtain voting control, and argued that Matthews violated the shareholders' rights by simply selling the company in exchange for his employment agreement. After conducting a hearing, the trial court denied C.E.C.'s motion.

**B.     Analysis**

We review the denial of a Rule 59(a) motion for a new trial for an abuse of discretion. Sanjuan v. IBP, Inc. , 160 F.3d 1291, 1296 (10th Cir. 1998). The trial court has considerable latitude when ruling on such a motion, and the court's decision will not be disturbed on appeal except for a showing of an abuse of that discretion. Brownlow v. Aman , 740 F.2d 1476, 1491 (10th Cir. 1984). Likewise, the grant or denial of a motion to amend the trial court's findings under Rule 52(b) is "committed to the sound discretion of the district court and will not be disturbed absent an abuse of that discretion." 9A Charles Alan Wright et al., Federal Practice and Procedure § 2582, at 162 (2d ed. Supp. 1999); accord Sequa Corp. v. GBJ Corp. , 156 F.3d 136, 143 (2d Cir. 1998); National Metal Finishing Co. v. BarclaysAmerican/Commercial, Inc. , 899 F.2d 119, 125 (1st Cir. 1990).

**1.     C.E.C.'s "additional evidence" argument**

C.E.C.'s initial argument – that a new trial should have been granted for the limited purpose of admitting additional evidence – is unpersuasive. A party

17

seeking a new trial under Rule 59 based on new evidence must show (1) the evidence was discovered since the trial; (2) the party was diligent in discovering the evidence; (3) the evidence was not merely "cumulative or impeaching;" (4) the evidence was material; and (5) the evidence probably would have produced a different result at trial. Joseph v. Terminix Int'l Co., 17 F.3d 1282, 1285 (10th Cir. 1994); accord Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1529 (10th Cir. 1997); see also 11 Charles Alan Wright et al., Federal Practice and Procedure § 2808, at 86-94 (2d ed. 1995) (stating that the standard for a new trial under Rule 59(a) requires that (1) "[t]he moving party must have been excusably ignorant of the facts despite using due diligence to learn about them;" (2) the newly discovered evidence must be "admissible and probably effective to change the result of the former trial;" and (3) the newly discovered materials must do more than "merely affect the weight and credibility of the evidence" and cannot be "cumulative of evidence already offered"). Here, the evidence proffered by C.E.C. was in the company's possession prior to trial. Matthews' deposition testimony obviously was available before February 1998, and C.E.C. essentially concedes that the September 30, 1993 minutes were in Leedy's possession before the commencement of trial. See Aplt. App. at 197 (indicating that Baker found the minutes in Leedy's files). These facts are fatal to C.E.C.'s

18

position on appeal. [7]

Moreover, C.E.C.'s proffered evidence was cumulative and would not have produced a different result. As discussed below, C.E.C. educed testimony at trial that sufficiently permitted the company to argue that the Board of Directors was not disinterested when it approved Matthews' employment agreement. For that reason, it is highly unlikely that C.E.C.'s proffered evidence would have changed the outcome of the proceedings. That much is evident from the trial court's comments during the hearing on C.E.C.'s motion for a new trial. After fully considering C.E.C.'s proffered evidence and listening to an extended argument on the matter by the company's attorney, the court stated:

> As far as your argument that the new evidence in combination with the trial transcript shows the board of Directors was not disinterested and therefore the business judgment rule should not apply, I simply find that the evidence, new and old – and I'm just putting aside why . . . the new wasn't advanced at trial – but I find that evidence simply does not support that conclusion.

Aplt. App. at 630.

---

[7] "[I]t has been held that a new trial may be granted even though proper diligence was not used if this is necessary to prevent a manifest miscarriage of justice." 11 Charles Alan Wright et al., Federal Practice and Procedure § 2808, at 91 (2d ed. 1995) (citing, among other cases, Ferrell v. Trailmobile, Inc., 223 F.2d 697, 698 (5th Cir. 1955)). Nothing in the record suggests that the trial court's failure to hold a new trial in this case resulted in a "manifest miscarriage of justice."

19

## 2.     C.E.C.'s "interested directors" argument

More complicated is C.E.C.'s challenge to the trial court's determination that the agreement was ratified by a disinterested Board. Robinson and the Stoeckleins, the three board members who approved the agreement, were also members of the Las Vegas Group. C.E.C. contends that these three individuals were not "disinterested" because they struck a deal with Matthews. That "deal" required Matthews to transfer control of the company to the Group in exchange for his employment agreement. To bolster this theory, C.E.C., through its counsel Leedy, elicited several statements from Matthews at trial:

> Q  . . . Isn't it true, Mr. Matthews, that in connection with your deal when . . . the Las Vegas Group took over control of C.E.C. . . . you required the employment contract; that's a fair statement, is that not correct?
> A  Correct.
> Q  When you passed control to the Las Vegas Group, you required the C.E.C. consulting agreement as part of them taking control, you also required, did you not, that they give you an irrevocable proxy to vote C.E.C. shares in C.E.I.?
> A  Correct, for three years. . . .
> Q  . . . So they [the Las Vegas Group] gave you a pitch as to what they could do for C.E.C., and you made certain requirements as to what they had to do to – for you to give them control; is that correct?
> A  Yes. . . .

Aplt. App. at 433-34. Leedy posed similar questions to Matthews later in the trial:

> Q  You were discussing . . . on September 30th, [1993,] that they [the Las Vegas Group] would take control of C.E.C.?
> A  It was agreed to prior to that, yeah. . . .

20

Q Isn't it true that you required an employment contract before you would give up control of C.E.C.?
A As part of the deal, yes.
Q . . . [I]n connection with your transfer of control to C.E.C., part of your consideration was to get an employment contract?
A That's correct. I would not turn over control to a strange group without having –
Q An employment contract?
A – an employment contract. . . .
Q . . . [Y]ou were not going to release control of C.E.C. until they gave you an employment contract?
A I probably would not have, that's correct. . . .
Q So you transferred control of C.E.C., in exchange for which you get a hundred thousand dollars a year, plus a right to vote the shares of C.E.I.; is that correct?
A That's correct.

Id. at 437-38, 439-40. Notwithstanding Matthews' remarks, the trial court rejected C.E.C.'s "quid pro quo" theory and concluded that the Las Vegas Group obtained control of the company for consideration other than a promise of continued employment to Matthews.

We review the trial court's resolution of this issue of fact for clear error. The Federal Rules of Civil Procedure expressly provide that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed. R. Civ. P. 52(a); accord Mid-West Conveyor Co. v. Jervis B. Webb Co. , 92 F.3d 992, 997 (10th Cir. 1996). "A finding of fact is 'clearly erroneous' if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a

21

definite and firm conviction that a mistake has been made." Manning v. United States, 146 F.3d 808, 812 (10th Cir. 1998) (citation omitted); accord Zimmerman v. Sloss Equip., Inc., 72 F.3d 822, 825 (10th Cir. 1995).

The trial court's rejection of C.E.C.'s "quid pro quo" theory may have been debatable, but it was not clearly erroneous. At the hearing on C.E.C.'s motion for a new trial, the court thoroughly explained the basis for its ruling. After taking into consideration C.E.C.'s "new" evidence, the court found that

> the evidence still shows that the Las Vegas Group came in, and what was given by the Las Vegas Group was real property. . . . I think it was very clear that the quid pro quo was the real property that the Las Vegas Group by some means was going to deliver. And that was not only in the minutes that [C.E.C.] proposed, the September 30th minutes, but there was a lot of trial testimony about . . . whether that was a good deal for the company. Although it's certainly true that Mr. Matthews wanted to stay employed, and that he was going to fight for that employment agreement, I don't think the evidence shows that that was the quid pro quo. There was evidence that the new board had valid reasons for keeping Mr. Matthews on. He testified he'd founded the company. He was the only one totally familiar with its workings. He was needed to handle sale of assets. He was needed to run C.E.I. And although . . . his duties diminished, he did work. He did perform services.

Aplt. App. at 630-31. These findings are not "without factual support in the record," see, e.g., id. at 332-33 (stating that the parties understood that the Las Vegas Group would "bring in" some "income producing properties" to finance research and development); id. at 333, 336-37 (stating that property worth several million dollars was contributed to C.E.C. after the Las Vegas Group assumed

22

control); id. at 339-40, 342-45 (stating that Matthews retained and fulfilled certain responsibilities to the company under the employment agreement), and thus do not justify reversal.

### 3. C.E.C.'s "illegal sale" argument

C.E.C. waived its final point by failing to raise it before or during trial. In its motion for a new trial, C.E.C. argued for the first time that Matthews illegally sold the company to the Las Vegas Group without obtaining the approval of shareholders. It is well settled that motions for new trials "cannot be used to raise arguments which could, and should, have been made before the judgment issued. Moreover, they cannot be used to argue a case under a new legal theory." Simon v. United States, 891 F.2d 1154, 1159 (5th Cir. 1990) (quoting Federal Deposit Ins. Corp. v. Meyer, 781 F.2d 1260, 1268 (7th Cir. 1986)); see also Sequa, 156 F.3d at 144 (affirming that "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple'"); Midamar Corp. v. National-Ben Franklin Ins. Co. of Illinois, 898 F.2d 1333, 1338 (8th Cir. 1990) (stating that a party "should not be granted a new trial so that a new theory of defense, not urged at the first trial, can be asserted") (citation omitted); 11 Charles Alan Wright et al., Federal Practice and Procedure § 2805, at 58-59 (2d ed. 1995) (same).

C.E.C.'s assertion that it raised the "illegal sale" argument prior to trial is inaccurate. C.E.C. attempts to support this assertion by pointing to three "Contested Issues of Law" in the pretrial order: (1) "Is plaintiff's employment contract unenforceable as constituting self-dealing by plaintiff?" (2) "Has plaintiff's wrongful conduct precluded his recovery under the employment contract?" (3) "Is plaintiff's employment contract unenforceable as plaintiff and the other directors' approval thereof was in breach of the fiduciary duties owed to C.E.C. Industries Corp. and its stockholders?" Aplt. App. at 47. As the mere restatement of these issues makes clear, however, the focus of the pretrial order was whether Matthews and the Board acted properly by ratifying the employment agreement. The trial court resolved this dispute by concluding that the agreement was neither contrary to the interests of the company nor demanded as a quid pro quo for the right to control C.E.C. Whether Matthews illegally sold the company without obtaining shareholders' approval presents a distinct issue not addressed in the pretrial order.

## III. The Motion for Attorney Fees

C.E.C.'s objection to the trial court's decision to award Matthews two-thirds of his attorney fees is without merit. After finding in Matthews' favor on two of his three claims, the court based the award on the following provision of

24

Matthews' employment contract: "The prevailing party in any action to enforce the terms and conditions of this Agreement shall be entitled to payment by the other party of the prevailing party's actual attorneys' fees and costs of enforcement, whether in litigation or negotiated settlement." Id. at 637. C.E.C. contends that Matthews should have been awarded only one-third of his fees because the "stop transfer" claim sounded in tort rather than contract. This argument exalts form over substance. As Matthews correctly notes in his appellate brief, the only contested issue in connection with the "stop transfer" claim was whether the agreement lawfully conveyed stock shares to him in the first place. The claim was part and parcel of an "action to enforce the terms and conditions" of the agreement.

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge