# United States Court of Appeals for the Federal Circuit

04-1609, 05-1141, -1202

GOLDEN BLOUNT, INC.,

Plaintiff-Appellee,

v.

ROBERT H. PETERSON CO.,

Defendant-Appellant.

Charles W. Gaines, Hitt Gaines, P.C., of Richardson, Texas, argued for plaintiff-appellee. With him on the brief was Greg H. Parker. Of counsel on the brief was William D. Harris, Jr., Schultz & Associates, of Dallas, Texas.

Leland W. Hutchinson, Jr., Freeborn & Peters, of Chicago, Illinois, argued for defendant-appellant. With him on the brief were Jennifer L. Fitzgerald and David S. Becker.

Appealed from: United States District Court for the Northern District of Texas

Senior Judge Jerry Buchmeyer

# United States Court of Appeals for the Federal Circuit

04-1609, 05-1141, -1202

GOLDEN BLOUNT, INC.

Plaintiff-Appellee,

v.

ROBERT H. PETERSON CO.,

Defendant-Appellant.

_____

DECIDED: February 15, 2006

_____

Before MICHEL, Chief Judge, LOURIE, and LINN, Circuit Judges.

LINN, Circuit Judge.

Robert H. Peterson Co. ("Peterson") appeals from final orders finding that Peterson willfully infringed U.S Patent No. 5,988,159 ("the '159 patent"), and awarding Golden Blount damages and attorney fees. Golden Blount, Inc. v. Robert H. Peterson Co., No. 3-01-CV-0127-R (N.D. Tex. Dec. 15, 2004) (Final Judgment); Golden Blount, Inc. v. Robert H. Peterson Co., No. 3:01-CV-0127-R (N.D. Tex. Nov. 15, 2004) (Attorney Fees Order); Golden Blount, Inc. v. Robert H. Peterson Co., No. 3-01-CV-0127-R (N.D. Tex. Sept. 2, 2004) (Infringement Order). Because the district court did not clearly err in finding that Peterson willfully infringed the '159 patent, we affirm the district court's judgment of willful infringement and the award of attorney fees based principally thereon. However, because the district court did not address certain returned

units in its calculation of damages, we vacate the damages award and remand that limited aspect of the case to the district court with instructions to reexamine the number of products sold and, if necessary, re-compute damages and enter judgment thereon consistent with this opinion.

## I. BACKGROUND

On January 18, 2001, Golden Blount filed suit against Peterson for infringement of the '159 patent, which relates to fireplace burners and associated equipment. Beginning on July 29, 2002, the district court held a bench trial. On August 9, 2002, the district court found willful infringement, held that the claims were not invalid, awarded damages and attorney fees, and granted an injunction. Peterson appealed to this court and, in April 2004, we construed certain claims of the '159 patent, affirmed the validity determination, vacated the judgment as to infringement, and remanded for specific factual findings. See Golden Blount, Inc. v. Robert H. Peterson Co., 365 F.3d 1054 (Fed. Cir. 2004) ("Golden Blount I"). Because we vacated the judgment with respect to all issues of infringement, we also vacated and remanded the judgment as to willfulness, the exceptional nature of the case, and damages. Id. at 1061.

In the district court on remand, both parties filed proposed findings of fact. On June 22, 2004, the district court adopted Peterson's proposed findings of non-infringement. On July 6, 2004, Golden Blount filed a motion under Rule 52(b) of the Federal Rules of Civil Procedure ("Rule") to amend the judgment, and alternatively, a Rule 59 motion for a new trial. On August 8, 2004, the district court granted Peterson's petition for attorney fees. However, on August 18, 2004, the district court heard oral argument on Golden Blount's Rule 52(b) motion and decided that "[it] made a mistake"

in adopting Peterson's findings. From the bench, the district court vacated Peterson's findings and the award of attorney fees, and requested that Golden Blount provide "the necessary findings and necessary final judgment."

On August 31, 2004, Golden Blount submitted another set of proposed findings, which the district court adopted and entered on September 2, 2004. The district court found that Peterson both directly and indirectly infringed the '159 patent and that infringement was willful. The district court calculated lost-profit damages to be $429,256, trebled the award to $1,287,766, and awarded Golden Blount attorney fees and post-judgment interest.

On September 8, 2004, Golden Blount filed a formal application for attorney fees. On September 17, 2004, Peterson lodged an appeal from the August 18, 2004 order. On November 15, 2004, the district court calculated the amount of attorney fees to be $622,015. On December 9, 2004, Peterson appealed from the award of attorney fees. On December 15, 2004, the district court entered final judgment, and, on January 14, 2005, Peterson appealed from that order. On February 15, 2005, we consolidated the appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

### A. Preliminary Matters

Peterson argues that the district court clearly erred in vacating <u>all</u> of its June 22, 2004 findings because Golden Blount's Rule 52(b) motion only sought amendment of <u>some</u> of the findings and Golden Blount did not file another Rule 52(b) motion after August 18, 2004. Alternatively, Peterson argues that the district court lacked jurisdiction to enter the September 2, 2004 findings because the August 18, 2004 Minute Order

04-1609, 05-1141, -1202                    3

was an appealable judgment that Golden Blount did not seek to amend within ten days as required by Rule 52(a). Peterson adds that, even if this court does not strike the September 2, 2004 findings, it should apply greater scrutiny than "clear error" review because the district court adopted Golden Blount's findings verbatim.

Golden Blount counters that it need not have filed another Rule 52(b) motion with its August 31, 2004 proposed findings because its original Rule 52(b) motion was adequate and because it was complying with the district court's August 18, 2004 order. Golden Blount adds that the district court had jurisdiction to enter the September 2, 2004 findings because the August 18, 2004 order was not an appealable judgment and did not start the ten-day clock. Alternatively, Golden Blount asserts that the district court retained jurisdiction to change its judgment under Rule 60(b)(6). Golden Blount maintains that even if this court reviews the findings very closely because they were adopted verbatim, the standard that the court must apply is that of "clear error." We agree with Golden Blount.

Because the issue of whether the district court properly granted a Rule 52(b) motion to amend its findings is not unique to patent law, we apply regional circuit law, here, that of the Fifth Circuit. See Panduit Corp. v. All States Plastic Mfg. Co., 744 F.2d 1564, 1574-75 (Fed. Cir. 1984), overruled on other grounds by Richardson-Merrell Inc. v. Koller, 472 U.S. 424 (1985). Although we could find no Fifth Circuit decision setting out the standard of review that is applied in that circuit to a district court's decision to amend its findings, we believe it reasonable to conclude that the Fifth Circuit would apply the abuse of discretion standard. 9 James Wm. Moore et al., Moore's Federal Practice ¶ 52.60[2], at 130 (3d ed. 2005) ("Moore's") ("The decision of whether to grant

or deny a motion to amend or enlarge the findings is within the discretion of the trial court."); see Weatherchem Corp. v. J.L. Clark, Inc., 163 F.3d 1326, 1336 (Fed. Cir. 1998) (finding no abuse of discretion in the denial of a Rule 52(b) motion).

Rule 52(b) provides that "[o]n a party's motion filed no later than 10 days after entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly." Fed. R. Civ. P. 52(b). "[A] party may move to amend the findings of fact even if the modified or additional findings in effect reverse the judgment. If the trial court has entered an erroneous judgment, it should correct it." Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1219 (5th Cir. 1986) (internal quotations omitted); accord Nat'l Metal Finishing Co. v. BarclaysAmerican/Commercial, Inc., 899 F.2d 119, 123 (1st Cir. 1990); 9 Moore's ¶ 52.60[1], at 130. Golden Blount filed its Rule 52(b) motion within 10 days of the entry of the June 22, 2004 findings, and called for the court to accept its "Amended Findings of Fact and Conclusions of Law," which were in most respects contrary to those made by the district court. Because the district court may reverse any or all of its findings in acting on a Rule 52(b) motion, see Fontenot, 791 F.2d at 1219; Nat'l Metal, 899 F.2d at 123, and because a Rule 52(b) motion provides the district court discretion to amend any of its own findings, see 9 Moore's ¶ 52.60[2], at 130-31, it matters not that Peterson's Rule 52(b) motion did not request all of the changes effected by the September 2, 2004 findings. The district court did not abuse its discretion in amending its findings and modifying its judgment accordingly. The cases to which Peterson cites are not germane.

Peterson's jurisdictional challenge also fails. The district court invited Golden Blount to submit additional findings and did not intend for the August 18, 2004 Minute

04-1609, 05-1141, -1202                    5

Order to dispose of the pending Rule 52(b) motion. See McLaughlin v. Mississippi Power Co., 376 F.3d 344, 350-51 (5th Cir. 2004) (finding that a district court order was not a final judgment because the district court did not intend to end the litigation with its order and continued to issue orders in the case); Pandrol USA, LP v. Airboss Ry. Prods., 320 F.3d 1354, 1362-63 (Fed. Cir. 2003) (noting that "whether an order constitutes a final judgment depends upon whether the judge has or has not clearly declared his intention in this respect in his opinion" (internal quotations omitted)). Thus, the Minute Order was not a final, appealable order. As a result, the district court retained jurisdiction to enter the September 2, 2004 findings. See 9 Moore's ¶ 52.62[1]-[2], at 139-40 (noting that the district court retains jurisdiction while a timely-filed Rule 52(b) motion is pending). The fact that the Rule 59 motion for a new trial remained pending until December 15, 2004 further supports this conclusion. While Peterson is correct that under Rule 58(a)(1)(B), a "separate document" is not required for an order to constitute a final judgment, that presupposes that the court, by the Minute Order, had disposed of the Rule 52(b) motion. Here, the district court did not dispose of the motion as it had requested and was awaiting Golden Blount's additional findings before entering judgment.

We reject Peterson's argument that Golden Blount should have submitted another Rule 52(b) motion after the August 18, 2004 hearing. Because the original Rule 52(b) motion was a sufficient basis on which the court could effect the changes in its findings, and because the Minute Order did not dispose of that motion, the

submission of another Rule 52(b) motion with the August 31, 2004 proposed findings was unnecessary.[1]

Finally, we reject Peterson's argument concerning the standard of review. While the district court's verbatim adoption of Golden Blount's factual findings may result in our close scrutiny, it does not affect our application of the clear error standard of review. See Anderson v. City of Bessemer City, 470 U.S 564, 572 (1985) ("[E]ven when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.").

## B. Infringement

The '159 patent relates to a fireplace assembly that

> is the combination of an inexpensive primary gas logs burner assembly [14] in gas flow communication with a secondary coals- and embers-burner tube [104] positioned forward and below the primary burner which operates to enhance the natural draft of the fireplace to improve efficiency of burn and aesthetic appeal of the gas-fired artificial logs, coals- and embers-burner assembly.

'159 patent, col. 3, ll. 54-60. Figure 2, below, illustrates the assembly.

---

[1] Alternatively, the district court on its own motion could have granted relief from judgment under Rule 60(b)(6). See, e.g., Fort Knox Music, Inc. v. Baptiste, 257 F.3d 108, 111 (2d Cir. 2001) (noting that "nothing forbids the court to grant such [Rule 60(b)] relief sua sponte"); McDowell v. Celebrezze, 310 F.2d 43, 44 (5th Cir. 1962) (recognizing that Rule 60(b) relief can be granted sua sponte).



FIG. 2

In <u>Golden Blount I</u>, we concluded that the "raised level" limitation in claim 1 refers to the top of the primary burner tube and requires that the top of the primary tube be above the top of the secondary burner tube. 365 F.3d at 1059-60. Likewise, we concluded that the "below" limitation in claim 17 required that the top of the secondary burner tube be below the top of the primary burner tube. <u>Id.</u>

Although Peterson sells its secondary burner (the "EMB") to distributors packaged separately from the primary burner, the district court found that Peterson both directly infringed claims 1, 15, and 17 of the '159 patent, by assembling the entire apparatus itself on a number of occasions, and indirectly infringed, by selling the EMB with instructions leading end-users to assemble the device into the claimed configuration. To make these findings, the district court concluded that Golden Blount had proven by a preponderance of the evidence that the "raised level" limitation of

claim 1 and the "below" limitation of claim 17 read on devices assembled both by Peterson and the end-users.

In support, the district court observed plaintiff's exhibit 4A ("PX4A"), a device assembled by Golden Blount to be representative of the combined Peterson primary burner and EMB. This exhibit showed that the top of the primary burner was raised relative to the EMB. The district court also referred to testimony of William McLaughlin ("McLaughlin"), Peterson's outside patent counsel, and Leslie Bortz ("Bortz") and Tod Corrin ("Corrin"), Peterson employees, that in view of defendant's exhibits 31 and 32 ("DX31" and "DX32") which together formed a device representative of Peterson's entire burner assembly, the top of the EMB is below the top of the primary burner. The court relied on defense exhibit 34 ("DX34"), an instruction sheet packaged with each EMB that tells owners "to tighten the . . . ember burner so that the valve faces forward and flush with the burner pan"; testimony of Bortz that normally the valve rests on the fireplace floor; and an observation that when the valve of the PX4A rested on a table flush with the pan, the top of the primary burner was above the top of the EMB. The district court also cited defense exhibit 30 ("DX30"), instructions which Peterson admits show the top of the primary burner to be above the top of the EMB. The court explained that "[t]here has been no reasons given . . . why Peterson didn't assemble these devices in accordance with its own instructions." The district court concluded that Peterson assembled the claimed apparatus to show distributors, and sold several pre-assembled units with a primary burner "substantially identical" to those sold individually to distributors. The district court also concluded that end-users assembled the device into the claimed configuration. The court reasoned that Peterson supplied the EMB with

instructions, explaining that "when instructions are provided . . . it can be circumstantially inferred that the customer follows those instructions with respect to the accused device."

As to contributory infringement, the district court found that Peterson knew that the combination for which its components were especially made was patented as of December 1999. The court found that the EMB had no non-infringing uses, that the EMB was not a staple article, and thus that Peterson was a contributory infringer. As to inducement of infringement, the court found that because Peterson knew about the patent as of December 1999, and because Peterson provided instructions to its customers on how to configure the components, Peterson knew or should have known that it was inducing infringement. The court cited to demonstrations that Peterson provided its distributors as evidence of inducement, and concluded that Peterson was an inducer.

On appeal, Peterson argues that even though it did not object at trial to the admission of PX4A, the exhibit is not entitled to weight because it is not authentic, and thus that the district court erred in relying on it. Peterson also asserts that neither DX30 nor DX34 proves that either Peterson or its customers made the infringing apparatus. As to the instruction sheet, DX34, Peterson asserts that it does not lead to the formation of an infringing configuration. As to the additional instruction sheet, DX30, Peterson argues that it was not distributed to all end-users, and thus cannot evidence infringement on the part of those end-users who did not receive it. Alternatively, Peterson asserts that these instructions do not apply to the devices that it sold pre-assembled because the primary burner on those devices is different than the primary

burner reflected in the instruction sheets. As to contributory infringement, Peterson argues that Golden Blount admitted that the apparatus can be configured in a non-infringing manner and thus that there can be no contributory infringement. As to inducement, Peterson asserts that cases that have relied on instructions as evidence of third party-infringement have found that following the instructions must result in infringement, and that infringement in this case is not a foregone conclusion based on the instructions. Finally, Peterson argues that it held a good-faith belief that neither it nor its customers were infringing, and thus that it did not have the requisite intent to induce. Golden Blount counters that the infringement findings were not clearly erroneous. We agree with Golden Blount.

Infringement is a question of fact reviewed for clear error. Golden Blount I, 365 F.3d at 1058. A factual finding is clearly erroneous when, despite some supporting evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made. United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).

The parties disagree on whether following the instructions would lead to the formation of an infringing configuration. Instruction sheet DX34, which was packaged with the EMB, instructs the user to install the valve flush with the burner pan. Bortz testified that the valve sits on the fireplace floor and the valve supports the EMB. Viewing the device that Peterson assembled for trial (the combined DX31 and DX32), McLaughlin and Bortz testified that the top of the primary burner was raised relative to the top of the EMB when the valve rested on the table (shown to be a flat surface).[2]

---

[2] On appeal, Peterson vigorously challenges the authenticity of exhibit PX4A, presumably because it believes that the district court relied on PX4A in finding infringement. However, the citations to the trial transcript provided by the district court

Moreover, Corrin admitted that instruction sheet DX30, which was offered to customers who requested it, illustrates an assembly with the top of the primary burner above the top of the EMB. Presented with this evidence, we conclude that the district court did not clearly err in finding that both DX34 and DX30 taught the infringing configuration. We reject Peterson's arguments to the contrary.

Next, the parties dispute whether direct infringement by Peterson can be inferred from Peterson's assembly of eleven units in light of both instruction sheets, and whether direct infringement by customers can be inferred from sales of the EMB packaged with DX34, and with DX30 available upon request. Circumstantial evidence can support a finding of infringement. See Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986) (holding that circumstantial evidence of extensive sales and dissemination of an instruction sheet can support a finding of direct infringement by the customer); Alco Standard Corp. v. Tenn. Valley Auth., 808 F.2d 1490, 1502-03 (Fed. Cir. 1986) ("Although the evidence of infringement is circumstantial, that does not make it any less credible or persuasive."). Peterson does not dispute that it assembled eleven devices itself and that each end-user that purchased an EMB attached it to a primary

in its opinion indicate that the district court was, in fact, relying on Golden Blount's demonstration of DX31 and DX32. Nonetheless, we reject Peterson's argument that we should accord PX4A no weight. Under Fifth Circuit law, in the absence of an authenticity objection, exhibits may be admitted and considered by the trier of fact for such probative value as they may have. Permian Petroleum Co. v. Petroleos Mexicanos, 934 F.2d 635, 647 (5th Cir. 1991). We may review the decision to admit the exhibit only for plain error. Id. at 648. There is no plain error in the district court's decision to admit exhibit PX4A. The testimony of Golden Blount's Golden Blount ("Blount") and Peterson's Vincent Jankowski ("Jankowski") identified the device shown in PX4A as Peterson's assembled product, and the district court was entitled to give the exhibit probative weight.

burner (or had an installer do it). In light of the concession that each EMB was attached to a primary burner; and given the evidence showing that DX34 was packaged with each EMB, that both the DX30 and DX34 instruction sheets teach an infringing configuration, and that the demonstration device assembled by Peterson at trial exemplified an infringing configuration, we conclude that the district court did not clearly err in finding that more likely than not, each time an EMB was attached to a primary burner by either Peterson or an end-user, the combination was infringing. See Moleculon, 793 F.2d at 1272. See also Metabolite Labs., Inc. v. Lab. Corp., 370 F.3d 1354, 1364-65, cert. granted in part, 126 S. Ct. 601 (2005) (holding that circumstantial evidence was sufficient to show that a method step was carried out by the direct infringer, even in the absence of direct evidence for each direct infringer).

We reject Peterson's argument that Golden Blount could not rely on the instruction sheets to prove acts of direct infringement by end-users. As for instruction sheet DX34, the argument is based on the premise that DX34 does not teach the infringing configuration. That premise is not valid, as we have concluded supra, that the finding that DX34 taught the infringing configuration was not clearly erroneous. As for instruction sheet DX30, the degree to which DX30 was disseminated—which is debatable on this record—is immaterial given the instructions set forth in DX34 and provided to each customer. Moreover, contrary to the view advanced by Peterson, it matters not that the assembled device can be manipulated into a non-infringing configuration, because the instructions packaged with each device teach the infringing configuration and nothing in the record suggests that either Peterson or any end-user ignored the instructions or assembled the burners in a manner contrary to the

instructions so as to form a non-infringing configuration. See Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1343 (Fed. Cir. 2001) ("[T]ests of an accused device under unusual conditions are not necessarily relevant to an infringement analysis."); cf. High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc., 49 F.3d 1551, 1555-56 (Fed. Cir. 1995) (finding that a device does not infringe if it does not infringe in its normal configuration, even if it may be altered into an infringing configuration under unusual circumstances).[3]

The next issue before us is whether Golden Blount carried its burden of proving that there were no substantial non-infringing uses of the EMB, and thus that Peterson was a contributory infringer under § 271(c). See Golden Blount I, 365 F.3d at 1061 (holding that the burden of persuasion is on the plaintiff). Relying on Peterson's admission that the EMB was not a staple article of commerce and was especially made or adapted for use with a primary burner, and evidence that the instruction sheets taught only the infringing configuration, the district court had ample basis to conclude that Golden Blount had made out a prima facie showing that Peterson's product was not "suitable for substantial non-infringing use," thus shifting the burden of production to Peterson. See Symbol Techs., Inc. v. Opticon, Inc., 935 F.2d 1569, 1575-76 (Fed. Cir. 1991) (explaining that once the patentee makes out a prima facie showing of infringement, the defendant can counteract it by cross-examining the patentee's evidence or putting on its own defense). We reject Peterson's argument that C.R. Bard,

---

[3]     We also reject the argument that the instructions cannot serve as evidence of infringement for the devices that Peterson sold pre-assembled. Based on Corrin's testimony, the district court did not err in finding that the burner depicted in the instruction sheet and the burners in the pre-assemblies were "substantially identical."

Inc. v. Advanced Cardiovascular Sys., Inc., 911 F.2d 670, 674-75 (Fed. Cir. 1990), disposed of Peterson's burden to come forward with rebuttal evidence. In C.R. Bard, we reversed a district court's grant of a motion for summary judgment of contributory infringement, reasoning that the device at issue, in theory, could be used in a way so as not to infringe the asserted method claim and that the record did not foreclose a reasonable fact-finder from concluding that the device was actually used in the non-infringing way. Id. In this case, which was decided not on summary judgment but after a bench trial, Golden Blount made out a prima facie showing that the EMB had no non-infringing use. The burden of production then shifted to Peterson to introduce some evidence that end-users actually assembled the burners in a non-infringing way. Having introduced no evidence that anyone actually made or used the assembly in a manner contrary to the instructions so as to form a non-infringing assembly, Peterson cannot complain that the district court found that the EMB was not "suitable for substantial non-infringing use." Thus, we conclude that the district court did not clearly err in finding that Peterson acted as a contributory infringer each time it sold an EMB that was ultimately assembled into an infringing device.

Finally, Peterson cites to Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1318 (Fed. Cir. 2003), Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1469 (Fed. Cir. 1990), and Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 553-54 (Fed. Cir. 1990), and argues that it held a good-faith belief that its instruction sheets would not lead to infringement based on opinions of counsel, and

that, as a matter of law, it lacked the intent necessary to find inducement.[4]  In both

Moba and Hewlett-Packard, we explained that "the only intent required of [defendant] is

the intent to cause the acts that constitute infringement."  Moba, 325 F.3d at 1318 (citing

Hewlett-Packard, 909 F.2d at 1469).  In this case, Peterson intended to cause the acts

that led to infringement because Peterson packaged its DX34 instruction sheet with the

EMB and intended to have customers assemble the apparatus in accordance with the

instructions.  Thus, the inducement finding is consistent with Moba and Hewlett-

Packard.  In Manville Sales, we reversed a finding of inducement because the alleged

inducer did not have notice of the patent until after suit was filed and the infringing acts

only continued after the alleged inducers acquired a "'good faith belief,' based on advice

---

[4]  The district court required that Golden Blount prove that Peterson knew or should have known that it was inducing infringement, a standard which Golden Blount has not challenged.  It should be noted that "there is a lack of clarity concerning whether the required intent must be merely to induce the specific acts [of infringement] or additionally to cause an infringement."  MercExchange, L.L.C. v. eBay, Inc., 401 F.3d 1323, 1332 (Fed. Cir. 2005) (citing Insituform Techs., Inc. v. CAT Contracting, Inc., 385 F.3d 1360, 1378 (Fed. Cir. 2004)), cert. granted in part, 126 S. Ct. 733 (2005); see Manville Sales, 917 F.2d at 553 ("The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." (emphasis in original)).  But see Hewlett-Packard, 909 F.2d at 1469 ("[P]roof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement.").  We need not resolve that ambiguity in this case, however, because it is undisputed that Peterson had notice of the patent following a December 1999 letter and that Peterson provided the DX34 instruction sheet to customers directing them to perform specific acts leading to the assembly of infringing devices, from which the district court could draw an inference of intent sufficient to meet either standard.  See MEMC Elec. Materials v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1378-80 & n.4 (Fed. Cir. 2005); see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 125 S. Ct. 2764, 2779-83 (2005) (drawing on the inducement of infringement standard long applied in the patent law context and "holding that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties").

of counsel, that [the] product did not infringe." 917 F.2d at 553-54; see supra note 4. Although Peterson argues that it acted in good faith and cites several oral opinions of counsel, we conclude for the reasons discussed infra Part II.C, that the district court did not clearly err in dismissing those opinions as incompetent and in finding that Peterson's assertions of good faith ring hollow. The inducement finding is not inconsistent with Manville Sales. Moreover, Peterson's argument that it could not have induced the infringement of those customers who did not receive the instruction sheet DX30 is of no moment as it is based on the erroneous premise that instruction sheet DX34, which was included with each product sold to all customers, does not lead to an infringing configuration.

For the foregoing reasons, we find no reversible error in the district court's findings that claims 1, 15, and 17 of the '159 patent were infringed.

## C. Willfulness

The district court considered the following evidence in finding that Peterson willfully infringed the '159 patent. On December 10, 1999, Golden Blount sent a letter to Peterson stating that the '159 patent had "issued," that Peterson was marketing a device that is "substantially similar to the burner assembly that is claimed in each of the claims of the subject patent," that Golden Blount would "take whatever steps are reasonable and necessary to prevent infringement," and that Peterson should alert Golden Blount of its "intentions" by January 14, 2000. On December 17, 1999, Corrin sent McLaughlin the "infringement letter" and a copy of "instructions and working drawings," and told him that "[w]e have been selling this product since May 1999." McLaughlin discussed the matter with Bortz over the phone. Bortz testified that he had

looked at the drawings and told McLaughlin that "for 20 years or more, the whole industry has been making things like this." McLaughlin testified that he gave Bortz an oral opinion that "if we can prove that what the Peterson Company was doing with the present product, the ember flame booster for 20 or 30 years, then either they would not infringe any claim . . . or . . . that claim would be invalid." At the time, McLaughlin did not possess the accused device, the file wrapper, or any prior art.

On December 30, 1999, Corrin sent a letter to Golden Blount, acknowledging receipt of the December 10, 1999, letter and stating that Peterson would "try to get back to [them] as soon as possible," but that January 10, 2000, is "unreasonable." Bortz testified that "[i]t was around Christmas time," and "[they] were trying to determine what the patent meant because [they] didn't see anything in the patent that wasn't things [they] had done for many years." On May 3, 2000, Golden Blount sent a letter to Peterson stating that it had not received a "response" from Peterson, that it had "inspected [the] EMB Series Ember Flame Booster and find [the EMB] to be clearly within the scope of at least some of the claims of the subject patent," and that it "will take necessary steps to stop any such infringement." On May 16, 2000, Peterson sent a letter to Golden Blount in reply, which stated, in pertinent part:

> [Y]ou are correct in that we have not yet responded.
>
> Our lack of response has been due to at least in part to our inability to understand what you want. Your December 10, 1999 letter states that your client has informed you that the Robert H. Peterson Company is "marketing a device that is substantially similar to the burner assembly that is claimed in each of the claims of the subject patent." We very much disagree with this statement.
>
> Your letter of May 3, 2000 states, "We have inspected your EMB Series Ember Flame Booster and find it to be clearly within the scope of at least some of the claims of the subject patent."
>
> Please explain to us, in detail, the basis upon which you believe that we are infringing on your client's patent.

McLaughlin testified that he thought it reasonable under the circumstances to ask for a more detailed explanation because he would respond to such letters "[u]sually by providing a more detailed explanation," which would be a "[c]ross reference [of] the elements of the claim to the accused products."

There was no further communication by either party until January 18, 2001, when Golden Blount filed suit. McLaughlin testified that after suit was filed, Bortz asked McLaughlin for another opinion of counsel, in part, because Bortz had heard that an opinion could help avoid a charge of willful infringement. The following is Bortz' trial testimony regarding his conversation with McLaughlin:

> Q      What was the other part of the conversation?
> A      Well, I couldn't understand the basis of the suit, the financial basis of the suit. And I just didn't see it all [sic] that there would be a reason to pursue. I didn't see any financial basis. So during the course of that conversation I did say [that] I have heard or have been told that in patent suits, if you lose, you may be required to pay fees of the other side.
> Q      And your concern, then, was over what could amount to those very large patent lawyer fees that you were talking about earlier. Your concern was about that rather than the fact that you might lose a rather small lawsuit; is that right?
> A      (no response)
> Q      Isn't that fair? That's what you told me, isn't it?
> A      Well, I didn't understand the financial basis of the lawsuit.
> Q      What do you mean by that, sir?
> A      What you've brought up today. Excuse me, yesterday. I'm sorry.
> Q      You were of the opinion, were you not, sir, that the maximum that you might have to pay would be tied in to just the little ember booster item itself?
> A      That was my own thought process.
> Q      And that wasn't really much worth messing with, was it?
> A      On a financial basis, that is correct.

McLaughlin testified that he gave his client two additional oral opinions, one in February 2001 and another in May 2001, both after suit had been filed. According to McLaughlin's testimony, in the February opinion, he stated that based on a picture and

a drawing of the accused device, he did not believe that the EMB literally infringed any claim of the '157 patent, and that at least some of the claims were invalid. In the May opinion, after reviewing the file wrapper for the first time, but still not having viewed the accused device, he concluded that none of the claims were literally infringed, that claims 1 through 18 were not infringed under the doctrine of equivalents, and that the remaining claims were invalid. McLaughlin testified that what he gleaned from an eventual inspection of the accused product, that he did not glean from the drawings, was insight into the "relative position" of the device.

In explaining its willfulness finding, the district court stated that in the two and one-half years after Peterson received notice of the patent, Peterson never obtained a written opinion of counsel and that the oral opinions obtained by Peterson were rendered without counsel having examined either the patent's prosecution history or the accused device, and were thus incompetent. The district court criticized Peterson for relying on an opinion of counsel based on the unproven representation of Bortz that the invention had been around for 20 to 30 years. The district court found that "Peterson made no further efforts to determine whether it was truly infringing or not, until after suit was filed," and that Peterson then sought another opinion in order to avoid a willfulness finding and liability for attorney fees. The district court also found that Peterson was not concerned about paying infringement damages because, according to Peterson, "the suit was not a very meaningful case 'dollarwise.'" The district court found that the opinions were "to be used only as an illusory shield against a later charge of willful infringement, rather than in a good faith attempt to avoid infringing another's patent." The district court found that Peterson's continued infringement through May 16, 2000,

and through the trial proceedings was particularly egregious. As to Peterson's explanation that it did not garner a more expansive opinion early on because it was awaiting "additional information or further explanation [of the infringement charge] from Blount's attorney," the district court found that "Blount did not, after sending multiple notice of infringement letters . . . owe Peterson any obligation with regard to advising Peterson how they actually were infringing."

Peterson challenges the district court's willfulness finding on two grounds. First, Peterson argues that the district court drew an inference of the type prohibited by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GMBH v. Dana Corp., 383 F.3d 1337 (Fed. Cir. 2004) (en banc). Peterson asserts that it had no duty to seek an opinion of counsel (let alone a competent opinion), and that the district court could not consider whether it obtained an opinion of counsel in evaluating whether it discharged its duty of due care. Peterson argues that while the lack of a competent opinion might leave it at a disadvantage in attempting to disprove willfulness, the lack of a competent opinion cannot help Golden Blount make out its prima facie case that Peterson acted willfully. Peterson asserts that because the district court must disregard the opinion-related evidence, the only affirmative evidence of willfulness—that Peterson sought to avoid paying attorney fees—does not amount to reckless conduct and thus the district court clearly erred in finding willfulness. Second, Peterson argues that even in the absence of a formal opinion of counsel, because it held a reasonable, good-faith belief that it did not directly infringe and that its instructions did not induce its customers to infringe, it did not act in reckless disregard of the patent and thus the willfulness finding was clearly erroneous. Peterson asserts that this good-faith belief was based on the facts that it

was not regularly selling a two-burner apparatus to distributors and that it thought that it was recommending to customers that the EMB be installed "level" with the primary burner, not "below" it.

Golden Blount counters that Peterson's understanding of the Knorr-Bremse decision is wrong and that Knorr-Bremse only addressed adverse inferences and merely eliminated the ability of the trier of fact to infer from the absence of an opinion letter that such an opinion, if rendered, would have been unfavorable to the potential infringer. Golden Blount further argues that the adverse inference holdings of Knorr-Bremse do not apply to this case because Peterson did not assert a privilege and "offered up" the opinions of counsel as a defense against the charge of willful infringement. Golden Blount asserts that the incompetent opinions, taken together with the other evidence presented, supports the finding of willfulness and that, based on all of the evidence, the district court's willfulness determination was not clearly erroneous.

Willfulness is a question of fact reviewed for clear error. Slimfold Mfg. Co. v. Kinkead Indus., Inc., 932 F.2d 1453, 1459 (Fed. Cir. 1991). "The extent to which the infringer disregarded the property rights of the patentee, the deliberateness of the tortious acts, or other manifestations of unethical or injurious commercial conduct, may provide grounds for a finding of willful infringement . . . ." Hoechst Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1583 (Fed. Cir. 1996). In this regard, "there continues to be 'an affirmative duty of due care to avoid infringement of the known patent rights of others.'" Knorr-Bremse, 383 F.3d at 1345-46 (quoting L.A. Gear Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 1127 (Fed. Cir. 1993)).

The patentee bears the burden of persuasion and must prove willful infringement by clear and convincing evidence. Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1190 (Fed. Cir. 1998). "There is no evidentiary presumption that every infringement is willful." Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1332 (Fed. Cir. 2004). "Willful infringement is not established by the simple fact of infringement," even where the accused has knowledge of the patents. Id.; accord Ajinomoto Co. v. Archer-Daniels-Midland Co., 228 F.3d 1338, 1351-52 (Fed. Cir. 2000). "The patentee must present threshold evidence of culpable behavior" before the burden of production shifts to the accused to put on evidence that it acted with due care. Norian, 363 F.3d at 1332 ("[A]bsent an initial presentation of evidence . . . this burden of coming forward in defense [does] not arise."). That threshold showing cannot be satisfied merely by proof that the accused is asserting the attorney-client privilege to withhold an opinion of counsel. As we explained in Knorr-Bremse, this court's precedent had (until that point) aided the patentee in making its case on willfulness by permitting the trier of fact to infer from an alleged infringer's failure to produce an opinion letter that such an opinion, if rendered, was or would have been unfavorable to the alleged infringer. 383 F.3d at 1343. See also Fromson v. W. Litho Plate & Supply Co., 853 F.2d 1568 (Fed. Cir. 1988). We overruled this precedent and held that "[t]he adverse inference that an opinion was or would have been unfavorable, flowing from the infringer's failure to obtain or produce an exculpatory opinion of counsel, is no longer warranted." Knorr-Bremse, 383 F.3d at 1344 (emphasis added); accord Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH, 408 F.3d 1374, 1378 (Fed. Cir. 2005) ("In that case, the affirmative duty of due care to avoid infringement was reiterated, but it was

found no longer appropriate to draw an adverse inference with respect to willful infringement from failure to obtain legal advice." (citing <u>Knorr-Bremse</u>, 383 F.3d at 1345-46)); <u>Insituform Techs., Inc. v. CAT Contracting, Inc.</u>, 385 F.3d 1360, 1377 (Fed. Cir. 2004) ("'[T]he failure to obtain an exculpatory opinion of counsel shall no longer provide an adverse inference or presumption that such an opinion would have been unfavorable.'" (quoting <u>Knorr-Bremse</u>, 383 F.3d at 1346)).

On the other hand, if the privilege is not asserted, the patentee in making its threshold showing of culpable conduct is free to introduce as evidence whatever opinions were obtained and to challenge the competence of those opinions in satisfaction of the patentee's burden on willfulness. Nothing in <u>Knorr-Bremse</u> precludes a patentee from attempting to make such a showing. <u>See</u> <u>nCUBE Corp. v. Seachange Int'l, Inc.</u>, No. 03-1341, 03-1366, 2006 WL 39053, at *5 (Fed. Cir. Jan. 9, 2006) (following jury verdict of willfulness, affirming the denial of a motion for JMOL where infringer received notice of the patent when suit was filed and obtained an incompetent opinion upon which the infringer relied in continuing to infringe); <u>Knorr-Bremse</u>, 383 F.3d at 1346-47; <u>Read Corp. v. Portec, Inc.</u>, 970 F.2d 816, 828-31 (Fed. Cir. 1992), <u>abrogated in part on other grounds by</u> <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967 (Fed. Cir. 1995) (en banc), <u>aff'd</u>, 517 U.S. 370 (1996) (explaining that willfulness may be found in cases in which opinions are incompetent, such as where an attorney does not examine necessary facts, or where the analysis is superficial).

We reject Peterson's argument that the district court drew an inference of the type prohibited by <u>Knorr-Bremse</u> from the fact that Peterson failed to obtain a competent opinion of counsel. The district court did not infer that if Peterson had

04-1609, 05-1141, -1202                    24

obtained a competent opinion regarding the '159 patent, the opinion would have been unfavorable to Peterson. That would have been an improper basis upon which to rest a willfulness finding. See Insituform, 385 F.3d at 1377 (vacating the district court's finding of willfulness for drawing the type of negative inference prohibited by Knorr-Bremse). Instead, the district court considered all of the facts presented in assessing whether Peterson acted in reckless disregard of Golden Blount's patent rights after receiving notice of the '159 patent. Here, Peterson did not assert the attorney-client privilege and Golden Blount offered up as evidence in its case on willfulness, inter alia, the legal infirmities of the several oral opinions that Peterson obtained. The competence of those opinions and the facts surrounding Peterson's obtaining of those opinions were relevant to the willfulness issue and properly were considered by the district court, along with all of the other evidence presented, both in assessing whether Golden Blount made out its prima facie case, see Norian, 363 F.3d at 1332-33, and in deciding whether Peterson's infringement was willful, see Insituform, 385 F.3d at 1377; Read, 970 F.2d at 828-31. See also nCUBE Corp., 2006 WL 39053, at *5. Therefore, Peterson's first argument to overturn the willfulness finding is without merit.

We also reject Peterson's second argument. The district court did not clearly err in dismissing Peterson's asserted good-faith belief in non-infringement, and thus in finding willfulness. Peterson made little-to-no effort to assess whether it infringed or whether the patent was invalid after receiving notice of the patent. The district court did not clearly err in according little weight to the first two oral opinions rendered by McLaughlin in light of the fact that McLaughlin did not have, and therefore could not have considered, the prosecution history or the accused device when the opinions were

given. McLaughlin's admission that he was able to better assess the "relative position" of the device when he was finally able to view the accused device illustrates the importance of possessing the accused device to the performance of an infringement analysis in this case. The district court also did not clearly err in criticizing Peterson's reliance on the representation of Bortz that the invention had been around for 20 to 30 years. Although the naked reliance on such a representation might have been reasonable if the accused product had been on the market for 20 to 30 years, the EMB in this case had only been on the market a short period of time and Peterson made little effort to uncover prior art until after suit was filed. Furthermore, the district court did not clearly err in dismissing Peterson's assertions that it could not directly infringe because it sold the EMB alone to distributors and that it could not induce infringement because it was recommending a "level" installation. As to the first argument, Peterson ignores the fact that its sales of components presented questions of contributory and induced infringement. As to the second argument, Peterson relies on testimony interpreting the instructions given to customers and testimony about how Peterson's burners ideally are positioned relative to one another. However, the district court had before it the actual instruction sheets, DX30 and DX34, which taught the infringing configuration, and evidence that at least DX34 was contained in the package given to each end-user. Finally, the district court did not clearly err in inferring that Peterson demonstrated a cavalier attitude toward Golden Blount's patent rights from the facts that Peterson did not respond substantively to Golden Blount's notice letters and that it only sought a thorough opinion of counsel after suit was filed, and then only out of a concern to avoid a willfulness finding and a possible judgment for attorney fees. Although other

inferences may be drawn from these facts, we do not have "a definite and firm conviction" that a mistake has been made. Given all of the evidence, Peterson's assertions that it subjectively did not believe it was infringing are insufficient to rebut the inference of reckless conduct adequately supported by the facts presented.

## D. Damages

The district court applied the test outlined in Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978), relied upon the largely un-impeached testimony of Blount and Corrin, and found that there was sufficient demand for the product for the period in question, that there were no acceptable non-infringing substitutes, and that Golden Blount had enough manufacturing and marketing capacity to promote the device. Based on Golden Blount's testimony that Peterson and Golden Blount controlled 95% of the market, the district court found that there was a two-supplier market and that "'but for' Peterson's infringing activities, Blount would have made the sales it normally would have made." The district court noted that "[t]o determine the actual damage amount in a lost profit case, [it had to] multiply Blount's per unit profit [on the lost sale] times the number of infringing devices that Peterson sold." The district court found that Golden Blount had established two alternative bases from which to conclude that it would have lost the sale of the entire burner assembly, the grate, and a full set of artificial logs. The district court explained that the first basis was Peterson's infringement of claim 15, which positively claims the burner assembly positioned underneath the artificial logs and a grate-support means. The district court explained that the second basis was the entire-market-value rule, finding that "the ember burner is the basis for the customer's demand" and that "the elements of

independent claims 1 and 17 [i.e., the burner assembly] constitute a functional unit with the artificial logs and the grate support." The district court cited the testimony of Charlie Hanft ("Hanft"), a third-party retailer, that 97.5% of the time he sells an ember burner, he sells an entire burner assembly and log set with it, noted that Peterson offered no numerical evidence on how often the EMB is sold with the entire burner assembly and log set, and concluded that Golden Blount had proven the "standard practice in the industry." As a result, the district court found that 97.5% of the time that Peterson sold an EMB, Golden Blount lost the sale of its entire burner assembly and a full set of logs, and that 2.5% of the time, Golden Blount lost the sale of its ember burner alone. Based on those percentages, the fact that Peterson sold 3,723[5] EMBs during the period in

---

[5] In its August 9, 2002 decision, the district court found that Peterson sold 3,689 EMBs during the period in question. Both parties sought to amend the district court's finding. In an August 22, 2002 motion Peterson sought to reduce the number of EMBs sold by 288 units, because Peterson had sold those units prior to receiving the December 10, 1999 notice letter. In an August 23, 2002 motion Golden Blount sought to increase the number of EMBs in the damages calculation to account for EMBs sold by Peterson that had been previously unreported because they had been sold between the date of Peterson's last sales report (April 30, 2002) and the judgment date (August 9, 2002).

In turn, in a September 19, 2002 motion, Peterson reported that it sold 322 EMBs between April 30 and September 19, 2002 but that it had received returns of 802 units between May 1, 2002 and September 19, 2002 (the majority of which presumably coming after entry of judgment). Peterson argued that it typically sells EMBs to distributors, that the distributors sells EMBs to retailers, and that the retailers assemble the EMB to the primary burner. Peterson asserted that the 802 returned units never made it to retailers and thus never became part of a directly infringing configuration. Because the 802 units never led to a direct infringement, according to Peterson, Peterson could not be liable for contributory or induced infringement and the 802 units could not be included in the damages award.

In a September 23, 2002 response, Golden Blount stated its agreement that the 288 units sold prior to the notice letter had to be subtracted from the damages calculation. In an October 4, 2002 response, Golden Blount stated its agreement that 322 units were to be added the damages award to account for sales between April 30 and August 8, 2002 bringing the total number of EMBs sold to 3,723. However, Golden Blount objected to reducing the figure by 802 units, arguing that Peterson could not "un-

question, and the fact that Golden Blount's per unit profit was $117.92 and $14.09 on its entire burner assembly and log set, and its ember burner alone, respectively, the district court calculated total damages at $429,256. Based on the willfulness finding, the district court trebled the award to $1,287,766.

On appeal, Peterson argues that Golden Blount failed to prove that the parties were competing for sales of two-burner installations, and thus that Golden Blount was required to (but failed to) show that it could retrofit the Golden Blount ember burner to existing Peterson primary burners. Peterson asserts that it had no obligation to put on evidence about how it sold its EMBs because Golden Blount did not make out a prima facie showing that Peterson's EMBs were sold with the entire assembly. Peterson also argues that the margin calculus for Golden Blount's profit should include several additional expenses, and adds that the damages award should not include 802 EMBs that it bought back from distributors because those units never led to the formation of infringing devices. Golden Blount responds that the damage calculation was not clearly erroneous.

The district court's choice of a damages theory is reviewed for abuse of discretion while factual findings concerning damages are reviewed for clear error. See In re Cambridge Biotech Corp., 186 F.3d 1356, 1369 (Fed. Cir. 1999). Any trebling of damages based on a finding of willfulness is reviewed for abuse of discretion. See Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 183 (Fed. Cir. 1994).

---

infringe" by withdrawing the products that it had sold to distributors. In a February 6, 2003 order, the district court ruled that "[t]he figures will not take into account any returns." Its March 7, 2003 final judgment and its September 2, 2004 findings used the 3,723 figure.

"To recover lost profits damages, the patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer." Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc). The patentee may rely upon the four-factor test articulated in Panduit to prove entitlement to lost profits damages. Id. "The Panduit test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capacity to exploit the demand; and (4) the amount of profit it would have made." Id. (citing Panduit, 575 F.2d at 1156).

For the most part, we find no clear error in the district court's application of Panduit and calculation of lost-profit damages. Golden Blount proffered sufficient evidence from which the district court could find that "but for" Peterson's sale of the EMB, which enabled the end-user to make the product covered by the '159 patent, the end-user would have turned to Golden Blount to satisfy its demand for the patented product. We reject Peterson's argument that the district court clearly erred in finding that the parties competed for sales of two-burner installations. Peterson stipulated that the EMB is made to be attached to Peterson's primary burner. A properly configured assembly infringes regardless whether the primary burner was bought years earlier or on the same day as the secondary burner. Moreover, based on the testimony of Hanft, who had sold some Peterson products in the past, the district court found that it was "standard practice in the industry" to sell the ember burner as part of the purchase of the entire burner assembly.[6] Although this evidence was not irrefutable, it was sufficient to

---

[6] In a September 19, 2002 motion, Peterson conceded that "retail stores . . . put the ember flame boosters together with the [primary] burners," which further supports the standard industry practice finding.

shift the burden of production to Peterson. See id. at 1545 ("The patentee need only show that there was a reasonable probability that the sales would have been made 'but for' the infringement . . . . The burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales."). By coming forward with no quantitative evidence to rebut this testimony, Peterson left itself open to the inferences reasonably drawn by the district court. We also reject Peterson's arguments regarding the profit margins on each lost sale. The district court based its findings on both documentary and testimonial evidence, and Peterson has failed to convince us that these findings were clearly erroneous.

However, as to the 802 EMBs allegedly returned to Peterson before being assembled into an infringing configuration, there is evidence that Peterson did receive 802 EMBs as returns from distributors, but the district court made no findings as to those returns. See supra note 5. If the 802 EMBs were returned before having been sold to retailers and thereafter assembled into an infringing configuration, they should not have been included in the damages calculus. Golden Blount begs to differ, arguing that once the district court found one act of direct infringement by a Peterson customer, the district court could presume that each sale of an EMB to a distributor constituted one additional act of contributory or induced infringement, which in turn gave rise to a cognizable lost sale. However, it is horn-book law that "[l]iability for either active inducement of infringement or contributory infringement is dependent upon the existence of direct infringement." Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 774 (Fed. Cir. 1993). In applying this rule to the damages issue in this case, Standard Havens

Products, Inc. v. Gencor Industries, Inc., 953 F.2d 1360, 1372-74 (Fed. Cir. 1991), is instructive.

In Standard Havens, Gencor appealed a jury verdict finding that it had contributed to and induced infringement of a patent by selling asphalt plants that would lead to infringement of asserted method claims, and awarding lost profits covering the sales of ten asphalt plants. Id. at 1365. Reviewing this award, we noted that for three of the sales, although Gencor bid for the sale by advertising its infringing plant, the plants actually delivered were, in fact, non-infringing. Id. at 1374. Standard Havens argued that the "bait and switch" tactic caused it to lose sales of its own plants. However, we sided with Gencor and remanded for the district court to recalculate the award based on three fewer infringing plants, explaining that "because a contributorily infringing counterflow plant was not actually sold in those three instances, there was no direct infringement of the '938 patent and, thus, no contributory infringement." Id.

We believe that Peterson's shipping an EMB to its distributor but later receiving it as a return before it was assembled into an infringing combination is analogous to Standard Havens. Although the patentee in each case argues that there is a lost sale on which it is entitled to a lost profit, there can be no cognizable lost sale on which to base a damages award under the patent laws without an act of infringement to warrant it. See id. at 1374; see also 35 U.S.C. § 284 (2000) ("Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement . . . ." (emphasis added)); Rite-Hite, 56 F.3d at 1545 (recognizing that the loss of a sale must be caused by an infringing act). If 802 EMBs were returned before assembly into an infringing configuration, there would be 802 fewer acts of direct

infringement and Peterson would be liable for 802 fewer acts of contributory or inducing infringement. If there were 802 fewer acts of contributory or inducing infringement, Golden Blount would have lost 802 fewer sales.

Because the district court failed to address the 802 EMBs allegedly returned to Peterson in its September 2, 2004 findings of fact, we vacate the damages award and remand for the limited purpose of determining whether the 802 EMBs were in fact returned to Peterson by Peterson's distributors before having been assembled into an infringing configuration. If the 802 EMBs were so returned, then the damages award should be recomputed using the reduced number of units sold to distributors. If the 802 EMBs were not in fact returned or were assembled into an infringing configuration prior to being returned, the original damage award should be reinstated. We have considered the remaining arguments and find them to be without merit.

### E. Attorney fees

Based on the finding of willfulness, the district court found the case exceptional and awarded Golden Blount attorney fees in the amount of $622,015. Peterson argues that the district court clearly erred in marking the case exceptional because it clearly erred in its willfulness finding. Peterson also asserts that the district court clearly erred in granting attorney fees because the application was submitted on September 8, 2004, and "[t]ime for further post trial motions expired on September 1, 2004."

An exceptional case finding is one of fact reviewed for clear error. Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1370 (Fed. Cir. 1999). Once a case is deemed exceptional, any award of attorney fees is reviewed for abuse of discretion. Id.

Because Peterson's challenge to the attorney-fees award was based on its argument that the district court clearly erred in finding willfulness, an argument we have rejected, we have no reason to disturb the district court's exceptional case determination or its award of attorney fees. Peterson's argument that Golden Blount filed its motion for attorney fees out of time also lacks merit. As discussed <u>supra</u> Part II.A, the August 18, 2004 Minute Order was not a final judgment and thus the fourteen-day period specified in Rule 54(d)(2)(B) did not begin running on that date. The application for attorney fees was timely filed within fourteen days after entry of the September 2, 2004 findings.

## III. CONCLUSION

Because the district court did not clearly err in finding that Peterson willfully infringed the '159 patent, we affirm the district court's judgment of willful infringement and the award of attorney fees based principally thereon. However, because the district court failed to address whether the 802 EMBs allegedly repurchased by Peterson should have been included in the calculation of damages, we vacate the damages award and remand that limited aspect of the case to the district court for further proceedings consistent with this opinion.

<u>AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED</u>

## IV. COSTS

No costs.